*93 MR. JUSTICE MORRISON
delivered the Opinion of the Court.
This appeal arises from two consolidated cases that originated as petitions for judicial review of a Department of Natural Resources and Conservation (DNRC’s) final order which granted the Monforton’s beneficial water use permit.
Monfortons applied for the use permit in October 1979 to appropriate water from Cold Springs, a tributary of the Boulder River. Montana Power Co. (MPC) and downstream irrigators (Huckaba/Felsheim) filed timely objections. Subsequent to a public hearing where applicants and all objectors were represented, the DNRC issued a final order granting the permit conditioned upon specific restrictions.
Petitions for judicial review filed by Monfortons and MPC were consolidated to be heard in the District Court of the First Judicial District Lewis and Clark County, Honorable W. W. Lessley presiding. Upon review, the court held that the DNRC exceeded its statutory authority by imposing restrictive conditions on the permit and reinstated the water use permit in accordance with the terms of the Monforton’s application. Pursuant to Monforton’s subsequent motion, the District Court imposed reasonable attorney’s fees upon MPC and Huckaba/Felsheim.
Both MPC and Huckaba/Felsheim filed notices of appeal concerning both the granting of the use permit and the taxation of attorneys fees.
Monforton’s permit application sought authorization to divert 1,575 gallons per minute up to 623 acre-feet per year from April 15 through October 15 of each year from Cold Springs for sprinkler irrigation on 331 acres of land in Jefferson County, Montana.
The objectors to the Monforton application collectively assert that insufficient unappropriated water flows in Cold Springs to satisfy both existing rights and the Monforton’s proposed diversion. Montana Power Company (MPC), a Montana corporation, owns and operates six hydroelectric *94 generation facilities located on the Missouri River downstream from the Monforton’s proposed, diversion point. Numerous existing water rights are appurtenant to these hydroelectric plants. Jessie Felsheim and Susanne Huckaba are members of a group of senior water right holders whose lands are also located downstream from the Monforton appropriation site.
DNRC’s final order granted the Monforton’s water use permit subject to the following limitations:
(1) The quantity of water to be appropriated was reduced from 623 acre-feet per year to 400 acre-feet per year.
(2) The period of time during which the appropriation could be made was limited to a period of time running from April 15 to August 1, rather than from April 15 to October 15.
(3) The permit was made subject to all prior and existing rights.
(4) The permit was made subject to the final determination of all prior and existing rights.
(5) The diversion authorized by the permit was expressly limited to times when Montana Power’s Cochrane Dam is spilling water.
Upon review, the district court held that:
(1) The DNRC violated statutory provisions found in the Water Use Act by limiting the Monforton’s period of use to a period ending August 1, and
(2) The conditions and limitations placed on the permit by the DNRC substantially prejudice the Monfortons’ right to appropriate water.
To correct these errors, the trial judge granted the Monforton’s permit and modified the DNRC’s final order:
(1) To allow a period of use running from April 15 to October 15;
(2) To allow diversion and appropriation of up to 623 acre-feet per year; and
(3) To remove the condition that Montana Power’s Cochrane Dam be spilling before the Monfortons can divert *95 water.
From the District Court’s judgment and subsequent determination of attorneys’ fees the defendants appeal. Although numerous questions are presented upon appeal, this court finds the following issues dispositive:
(1) Whether Sections 85-2-311 and 85-2-312, MCA grant the DNRC the authority to control and condition beneficial water use permits?
(2) Whether there is substantial credible evidence to support the DNRC’s order?
(3) Whether the District Court erred in taxing reasonable attorneys fees and costs?
Section 85-2-312, MCA provides in pertinent part as follows:
“Terms of permit. (1) The department may issue a permit for less than the amount of water requested, but in no case may it issue a permit for more water than is requested or than can be beneficially used without waste for the purpose stated in the application. The department may require modification of plans and specifications for the appropriation or related diversion or construction. It may issue a permit subject to terms, conditions, restrictions, and limitations it considers necessary to protect the rights of other appropriators, and it may issue temporary or seasonal permits. A permit shall be issued subject to existing rights and any final determination of those rights made under this chapter.
“(2) The department may limit the time for commencement of the appropriation works, completion of construction, and actual application of the water to the proposed beneficial use. In fixing those time limits, the department shall consider the cost and magnitude of the project, the engineering and physical features to be encountered, and, on projects designed for gradual development and gradually increased use of water, the time reasonably necessary for that gradual development and increased use. For good cause shown by the permittee, the department may in its *96 discretion reasonably extend time limits.”
To hold that the DNRC does not have authority to grant conditional use permits belies the plain language of this statute which clearly grants such power. Restrictions must be necessary to protect the rights of prior appropriators or be related to time limits to perfect the water right under the permit. Without such authority, the DNRC could only grant an application as applied for, or deny it, resulting in a permit system creating inchoate rights. Such uncontrolled development of a valuable natural resource contradicts the spirit and purpose underlying the Water Use Act.
State ownership of the water resource was recognized early in the evolutionary stages of water law.
“ “[T]he state of Montana has by necessary implication assumed to itself the ownership, sub modo, of the rivers and streams of this state, and, . . . has expressly granted the right to appropriate the waters of such streams, which right if properly exercised . . . vests in the appropriator full legal title to the use of such waters by virtue of the grant made by this state as owner of the water.” Smith v. Denniff (1900), 24 Mont. 20, 21-22, 60 P. 398 (Emphasis in original.) See also, Allen v. Petrick, supra, 69 Mont, at [373] 377; and Mettler v. Ames Realty Co. (1921), 61 Mont. 152, 161, 201 P. 702.
State ownership of the water resource was asserted in unambiguous terms by the 1971 Montana Constitution.
“(3) All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the State for the use of its people and are subject to appropriation for beneficial uses as provided by law.” Mont. Const. Art. IX, Section 3 (1972) (Emphasis added.)
Prior to 1973, when the Water Use Act was enacted, neither of the two distinct methods of acquiring water rights provided the state any control over acquisition of this state-owned natural resource. The first statutory method of appropriating water, legislated in 1885, required a prospective appropriator to post written notice at the place of in *97 tended diversion, and within twenty days of posting to file similar notice with the clerk and recorder in the county of the proposed diversion. Sections 89-810 through 89-814, R.C.M., (1947). Since the legislature did not declare this statutory method the exclusive method of acquiring water rights, the historical mining and local customs remained effective giving a water right to any individual who diverted water from a water source and applied the water to a beneficial use. Bailey v. Tintinger (1912), 45 Mont. 154, 169, 122 P. 575. The absence of a public record made the court’s task of determining the relative priority of conflicting claims to use the water resource an impossible task. The State had no means to regulate proposed water uses to accommodate available water flows and protect existing senior water rights nor to insure that the public interest was being promoted.
The Water Use Act, Section 85-2-101 et seq., MCA, was enacted in 1973. As the culmination of consistent urgings for reform, it “substituted a new procedure for the appropriation of water rights, . . . .” General Agriculture Corp. v. Moore (1975), 166 Mont. 510, 512, 534 P.2d 859. This reform was formulated upon beliefs similar to those expressed earlier by Mr. Elwood Mead, Wyoming’s first State Engineer:
“[I]f state ownership is to be anything but a delusion, if it is to be more than nominal, there must be the same authority and control over streams and over diversion of water as is now exercised by the general government over the occupation and settlement of public lands . . . Such oversight and precaution is necessary for the proper protection of public interests . . . and in order that controversies growing out of extravagant and injurious claims may be avoided.” Wyoming Hereford Ranch v. Hammond Packing Co. (1925), [33 Wyo. 14] 236 P. 764, 769.
The Water Use Act emphasizes the underlying policy of state participation in water appropriation “to recognize and confirm all existing rights to the use of any waters . . . .” *98 Section 85-2-101(4), MCA. This unambiguous language of the legislature promotes the understanding that the Water Use Act was designed to protect senior water rights holders from encroachment by junior appropriators adversely affecting those senior rights. Section 85-2-312, MCA, mandates the state’s authority to afford such protection.
The record of the trial proceeding contains substantial, credible evidence that the water supply source in Cold Springs was inadequate to sustain the Monforton’s proposed appropriation along with existing senior rights without the restrictions imposed by the DNRC.
Diana C. Fitz, a hydrologist for the Department of Natural Resources, in the Water Sciences Bureau, compiled a report entitled “Analysis of Water Availability on the Missouri River Above Canyon Ferry Reservoir.” Based on this documentation, Ms. Fitz’ testimony confirms the unavailability of water subsequent to the August 15 cutoff date imposed by the DNRC:
“Based on the data I had from Bureau of Reclamation and the U.S.G.S. I found that water was available during a short period of time during the spring and extending through at least a majority of irrigation season, on occasion. Basically, I found, for the most part, there was no water available 40% of the years. And, that during the other 60% of the years, there would be some water extending as long as possibly the beginning or maybe 9th or 10th of August.”
Representing Montana Power Co., Mr. Don Gregg testified that: (1) the Cochrane facility has the largest turbine capacity of putting water to beneficial use on the Missouri River; (2) the turbine rating is about 10,000 cubic feet per second; (3) the Cochrane plant has very limited storage capability, which handles daily fluctuations in the river, but no seasonal storage; and (4) when the Bureau of Reclamation’s rights have been satisfied at Canyon Ferry and the excess water is spilled, Cochrane utilizes only 27% of that spillage to satisfy MPC’s water rights for beneficial use.
Using hydrographs depicting available water flow over the *99 past twenty years, Mr. Gregg’s further testimony supported the lack of unappropriated water after the August 15 date restriction imposed on Monforton’s beneficial use permit:
“Q. Taking that into account, what would be your testimony, as to the . . . shall we say, the time window when water may be available or flowing in the river above 10,000 cfs.?
“A. ... on the basis of the 19 or 20 years history tabulated on this exhibit, that there will be around 71 days, starting on . . . around April 30 and ending on around July 10. When water will be available in . . . anywhere in the Upper Missouri Basin, above Great Falls, in excess of that that we can use at Great Falls, at the Cochrane plant.”
Based upon this credible testimony the District Court’s judgment is reversed and the DNRC’s final order is reinstated granting the beneficial water use permit conditioned by appropriate restriction.
In conjunction with this ruling, the Monforton’s claim for attorney’s fees must be denied. Since the final order of the DNRC is affirmed, the Monfortons are not the prevailing party and cannot recover attorney fees from the respondents.
Reversed.
MR. CHIEF JUSTICE HASWELL and MR. JUSTICES HARRISON, SHEA, WEBER and GULBRANDSON and THE HONORABLE THOMAS A. OLSON, District Judge, sitting for MR. JUSTICE SHEEHY concur.