FILED

09/13/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0813

DA 14-0813

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 229

THE CLARK FORK COALITION, a non-profit
organization KATRIN CHANDLER, an individual,
BETTY J. LANNEN, an individual, POLLY REX, an
individual, and JOSEPH MILLER, an individual,

        Petitioners and Appellees,

    v.

JOHN E. TUBBS, in his capacity as Director of
the Montana Department of Natural Resources
and Conservation and THE MONTANA
DEPARTMENT OF NATURAL RESOURCES AND
CONSERVATION, an executive branch agency
of the State of Montana,

        Respondents,

    v.

MONTANA WELL DRILLERS ASSOCIATION,

        Intervenors and Appellants,

    v.

MONTANA ASSOCIATION OF REALTORS and
MONTANA BUILDING INDUSTRY ASSOCIATION,

        Intervenors and Appellants,

    v.

MOUNTAIN WATER COMPANY,

        Intervenor.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Lewis and Clark, Cause No. BDV 2010-874
                Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Abigail J. St. Lawrence (Argued), Bloomquist Law Firm,
Helena, Montana
(*Attorney for MAR and MBIA*)

Ryan K. Mattick (Argued), Moore, O'Connell & Refling, P.C.,
Bozeman, Montana
(*Attorney for Montana Well Drillers Association*)

For Appellees:

Laura King (Argued), Matthew K. Bishop, Western Environmental
Law Center, Helena, Montana
(*Attorneys for the Clark Fork Coalition*)

Stephen R. Brown (Argued), J. Andrew Person, Garlington, Lohn
& Robinson, PLLP, Missoula, Montana
(*Attorneys for Mountain Water Company*)

For Amicus Curiae:

Tara DePuy, Attorney at Law, PLLC, Livingston, Montana
(*Attorney for Montana Associate of Counties*)

Steven J. Fitzpatrick, Browning, Kaleczyc, Berry & Hoven, PC,
Great Falls, Montana

Jesse J. Richardson, Jr., Attorney at Law, Morgantown, West Virginia
(*Attorneys for Water Systems Council*)

Jack R. Tuholske, Attorney at Law, Missoula, Montana
(*Attorney for Bitterrooters for Planning, et al.*)

Thomas J. Jodoin, City Attorney, Helena, Montana

Chris D. Tweeten, Tweeten Law, P.L.L.C., Missoula, Montana
(*Attorneys for Montana League of Cities and Towns*)

Laura S. Ziemer, Patrick Byorth, Meg Casey, Stan Bradshaw, Montana
Trout Unlimited, Bozeman, Montana

Argued and Submitted: May 18, 2016
Decided: September 13 2016

Filed:

_____
Clerk

2

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 The Water Use Act provides a comprehensive permit based system for new appropriations of water in Montana. The Act permits certain groundwater appropriations to be exempt from the permitting process. Relevant here, § 85-2-306(3)(a)(iii), MCA, provides an exemption when a groundwater appropriation does not exceed 35 gallons per minute and 10 acre-feet per year. However, the subsection also provides an "except[ion]" to the exemption when a "combined appropriation" from the same source by two or more wells or developed springs exceeds 10 acre-feet per year, regardless of flow rate.

¶2 The term "combined appropriation" is not defined within the Water Use Act. Since the adoption of § 85-2-306(3)(a)(iii), MCA, the state agency charged with administering the Act, the Department of Natural Resources and Conservation (DNRC), has taken contradictory positions regarding the meaning of the term. Specifically, within a period of six years, the DNRC promulgated consecutive rules with conflicting interpretations as to whether groundwater developments must be physically connected to constitute a "combined appropriation." Initially, in 1987, three months after the Legislature adopted the "combined appropriation" language, the DNRC promulgated Admin. R. M. 36.12.101(7) (1987), which provided that "[g]roundwater developments need not be physically connected nor have a common distribution system to be considered a 'combined appropriation.'" However, in 1993, the DNRC reversed its position and adopted the current administrative rule, Admin. R. M. 36.12.101(13), which

3

states that the term "combined appropriation" means "groundwater developments, that are physically manifold into the same system."

¶3 After an adverse ruling from the DNRC Hearings Examiner, a group of senior water users—Katrin Chandler, Betty Lannen, Polly Rex, Joseph Miller, and the Clark Fork Coalition (collectively, the Coalition)—challenged the validity of Admin. R. M. 36.12.101(13) in the First Judicial District Court, Lewis and Clark County. The Coalition maintained that the DNRC's definition of "combined appropriation" was inconsistent with the applicable statute arguing that the statute does not require physical connection. The District Court agreed. The court invalidated Admin. R. M. 36.12.101(13), reinstated Admin. R. M. 36.12.101(7) (1987), and directed the DNRC to formulate a new administrative rule consistent with the court's order. The Montana Well Drillers Association, the Montana Association of Realtors, and the Montana Building Industry Association (collectively, the Well Drillers) appeal from that order.[1] We affirm.

¶4 We address the following issues on appeal:

1. *Whether the District Court erred by invalidating Admin. R. M. 36.12.101(13).*

2. *Whether the District Court erred by reinstating Admin. R. M. 36.12.101(7) (1987).*

3. *Whether the District Court erred by directing the DNRC to institute rulemaking consistent with the court's order.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶5 In 1973, the Montana Legislature instituted the current water rights system by adopting the Montana Water Use Act, § 85-1-101, MCA, et seq. The Act sets forth the

---

[1] The DNRC has chosen not to appeal the District Court's decision.

4

statutory framework under which water rights are obtained, administered, and adjudicated. A critical component of the Act is the permit system administered by the DNRC. With certain exceptions, the Act requires those seeking new appropriations of water to apply to the DNRC for a permit. Section 85-2-301, MCA. The primary function of this permit based system is the protection of senior water rights from encroachment by prospective junior appropriators adversely affecting those rights. Section 85-2-101(4), MCA.

¶6 Consistent with this purpose, the Act imposes both substantive and procedural protections for water right users. Substantively, before the issuance of a new water appropriation, the Act requires that a prospective junior appropriator show that water is legally and physically available, the proposed use of water is for a beneficial use, and the new appropriation will not adversely affect existing water rights of senior prior appropriators. Section 85-2-311(1)-(2), MCA. Procedurally, a prospective junior appropriator must provide notice, through the DNRC, to senior users who may be affected by the proposed appropriation and must permit senior users an opportunity to object to the prospective water right. Section 85-2-307, MCA. If objections do arise from senior users, the DNRC must hold a contested hearing on the objections. Section 85-2-309, MCA.

¶7 Senior users are afforded even more protection in highly appropriated basins in Montana that have been closed from further surface water appropriations. In these "closed basins," where water claims often exceed water availability, the DNRC may not issue new surface water permits. Section 85-2-360(1)-(3), MCA. The DNRC may

consider groundwater permits, but the process for obtaining a groundwater permit in a closed basin is demanding. In addition to the general requirements for obtaining a permit, the appropriator must commission a hydrogeological report to determine if the proposed appropriation could result in a net depletion of surface water. Section 85-2-360(2), MCA. If the report indicates a hydrogeological connection, then the appropriator must show that there will be no net depletion of water. Section 85-2-360(3)(b), MCA.

¶8　　The Act provides certain exemptions to the rigorous permitting process. Section 85-2-306(1)-(9), MCA. If an appropriation qualifies for an exemption, none of the permitting procedures under the Act constrain the proposed appropriation. *See generally* § 85-2-306 (1)-(9), MCA. A prospective appropriator need not show that water is legally and physically available; that the new appropriation will not deplete surface flow; or that the water will not be used inconsistently with senior rights. *See generally* § 85-2-306(1)-(9), MCA. Nor does the appropriator need to provide notice to senior users or allow senior users an opportunity to object. *See generally* § 85-2-306 (1)-(9), MCA. Similarly, the more onerous requirements for obtaining an appropriation in a closed basin are inapplicable. *See generally* § 85-2-306 (1)-(9), MCA.

¶9　　Relevant to this case, § 85-2-306(3)(a)(iii), MCA, provides an exemption for groundwater appropriations considered de minimis; that is, those appropriations that do not exceed 35 gallons a minute and 10 acre-feet per year. In 1987, the Legislature incorporated the term "combined appropriation" into the de minimis groundwater exemption. Section 85-2-306(3)(a)(iii), MCA (1987), provided:

6

> a permit is not required before appropriating groundwater by means of a well or developed spring with a maximum appropriation of less than 100 gallons per minute, except that a combined appropriation from the same source by two or more wells or developed springs exceeding this limitation requires a permit.

Shortly after the incorporation of the "combined appropriation" language into the statute, the DNRC promulgated Admin. R. M. 36.12.101(7) (1987) (hereinafter, the 1987 rule). The 1987 rule provided that wells or developed springs "need not be physically connected nor have a common distribution system to be considered a 'combined appropriation.'" Instead, the 1987 rule instructed that two or more groundwater developments constitute a "combined appropriation" if used together for a single "project or development."

¶10 In 1991, the Legislature amended the statute. The Legislature reduced the permissible flow rate and imposed a volume limitation on the exemption, but retained the term "combined appropriation." Section 85-2-306(3)(a)(iii), MCA, as amended in 1991, provides:

> a permit is not required before appropriating ground water by means of a well or developed spring with a maximum appropriation of 35 gallons a minute or less, not to exceed 10 acre-feet a year, except that a combined appropriation from the same source from two or more wells or developed springs exceeding this limitation requires a permit.

¶11 In 1993, the DNRC promulgated Admin. R. M. 36.12.101(13) (hereinafter, the 1993 rule), significantly altering the administrative definition of the term "combined appropriation." The 1993 rule defines "combined appropriation" as "two or more groundwater developments, that are physically manifold into the same system." Under the 1993 rule, appropriations from the same source are exempt from the permitting

7

process as long as the groundwater developments making up the appropriations remain physically unconnected and do not exceed 10 acre-feet per year. Thus, the current rule allows an appropriator to avoid the permitting process for an infinite number of appropriations from the same source—with each appropriation consuming up to 10 acre-feet per year—so long as the appropriator does not physically connect the groundwater developments.

¶12 In 2013, the Legislature again amended the statute. The Legislature further reduced the permissible flow in stream depletion zones, left the permissible flow rate unaltered outside stream depletion zones, and once again retained the term "combined appropriation." Section 85-2-306(3)(a)(iii), MCA, as amended in 2013, provides, in relevant part:

> a permit is not required before appropriating ground water by means of a well or developed spring:
>
> . . .
>
> (iii) when the appropriation is outside a stream depletion zone, is 35 gallons a minute or less, and does not exceed 10 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding 10 acre-feet, regardless of the flow rate, requires a permit; or
>
> (iv) when the appropriation is within a stream depletion zone, is 20 gallons a minute or less, and does not exceed 2 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding this limitation requires a permit.

¶13 The Coalition cites data compiled by the DNRC that, since the DNRC's promulgation of the 1993 rule, exempt appropriations under § 85-2-306(3)(a)(iii), MCA, have grown steadily by approximately 3,000 each year. The DNRC estimates that there are now 113,000 exempt appropriations in Montana, consuming significant amounts of

8

water. The DNRC anticipates that exempt appropriations will continue to grow rapidly. By the year 2020, the DNRC projects that there could be an additional 78,000 exempt appropriations in Montana. Closed basins have not been immune from this trend. The DNRC estimates that 30,000 new exempt appropriations will be added in the next two decades in closed basins alone, resulting in an additional 20,000 acre-feet per year of water consumed in these already over-appropriated basins. The DNRC has recently acknowledged the concerns of senior users that the cumulative effects of these exempt appropriations are having a significant impact in terms of reducing groundwater levels and surface water flows and that the cumulative impact of the appropriations may be harming senior water users' existing rights.

¶14 On November 30, 2009, the Coalition petitioned the DNRC for a declaratory ruling that the 1993 rule was inconsistent with the exemption under § 85-2-306(3)(a)(iii), MCA, asserting that the term "combined appropriation" as used in the statute does not require physical connectivity between ground water developments. In the petition, the Coalition requested that the court invalidate the 1993 rule, reinstate the 1987 rule, and order the DNRC to conduct further rule making.

¶15 On August 17, 2010, the DNRC Hearings Examiner denied the Coalition's petition. The examiner concluded that the administrative rule was not in conflict with § 85-2-306(3)(a)(iii), MCA, reasoning that "a common, perhaps the most common definition, of 'combined' is physically joined together." The examiner acknowledged, however, that the administrative rule had caused the proliferation of exempt appropriations in a way that was not anticipated by the Legislature. As a result, the

examiner ordered the DNRC to initiate proposed rulemaking to repeal the 1993 rule and adopt a new administrative rule that would align more closely with legislative intent. The DNRC thereafter attempted to repeal and replace the 1993 rule, but, for reasons not made entirely clear by the record, failed to do so.

¶16    On September 14, 2010, the Coalition filed a complaint in District Court, challenging the DNRC Hearings Examiner's denial of its petition. The court invalidated the 1993 rule, reinstated the 1987 rule, and directed the DNRC to formulate a new administrative rule consistent with the court's order. The court provided three reasons for its decision to invalidate the administrative rule. First, after examining the 1987 legislative debate surrounding the incorporation of the term "combined appropriation" into the statute, the court explained that clearly, "the legislature was under the impression that the reference to 'combined' did not require two wells to be physically connected." Second, the court noted that the DNRC promulgated the 1987 rule, which did not require physical connection, immediately after the incorporation of the term into the statute. Lastly, the court explained that the 1993 rule fails to protect senior water users in accordance with the Act's express purpose. The court explained through the use of a hypothetical that the administrative rule allows large consumptive water uses to be established, without going through the permitting process, at the expense of senior users:

> The current definition of "combined appropriation" allows 1,000 new wells as part of a 1,000 lot subdivision to escape review under DNRC permitting . . . [and] allow[s] up to 10,000 acre feet a year of water to be potentially diverted from senior water rights holders neighboring or near the new 1,000 lot subdivision without any review.

¶17    The Well Drillers timely appealed from the District Court's decision.

10

## STANDARD OF REVIEW

¶18 "The interpretation of a statute is a question of law that we review for correctness." *Mont. Dep't of Revenue v. Priceline.com, Inc.*, 2015 MT 241, ¶ 6, 380 Mont. 352, 354 P.3d 631. "Whether an administrative regulation impermissibly conflicts with a statute is a question of law to be decided by the court." *Gold Creek Cellular of Mont. L.P. v. State*, 2013 MT 273, ¶ 9, 372 Mont. 71, 310 P.3d 533. "We review a district court's conclusions of law to determine if they are correct." *Gold Creek Cellular*, ¶ 9.

## DISCUSSION

¶19 *1. Whether the District Court erred by invalidating Admin. R. M. 36.12.101(13).*

¶20 When we assess the validity of an agency rule, we must begin with an examination of the statute itself. Our objective in interpreting a statute is to implement the objectives the Legislature sought to achieve. *Montana Wildlife Fed'n v. Sager*, 190 Mont. 247, 264, 620 P.2d 1189, 1199 (1980). The legislative intent is to be ascertained, in the first instance, from the plain meaning of the words used. *Boegli v. Glacier Mountain Cheese Co.*, 238 Mont. 426, 429, 777 P.2d 1303, 1305 (1989). If the intent of the Legislature can be determined from the plain meaning of the words used in the statute, the plain meaning controls and the Court need go no further nor apply any other means of interpretation. *Phelps v. Hillhaven Corp.*, 231 Mont. 245, 251, 752 P.2d 737, 741 (1988). In determining the statutory mandate given to a statute by the Legislature, it is important to remember that our role "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been

11

inserted." Section 1-2-101, MCA. Words and phrases used in a statute are to be construed according to the context in which they are found, and according to their normal usage, unless they have acquired some peculiar or technical meaning. Section 1-2-106, MCA. "When the legislature has not defined a statutory term, we consider the term to have its plain and ordinary meaning." *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 18, 354 Mont. 15, 221 P.3d 666. For the same reason that a contract term is not rendered ambiguous merely because the parties disagree as to its meaning, a statutory term is not rendered ambiguous because of subsequent inconsistent rules implemented by the agency. *See, e.g.*, *Scottsdale Ins. Co.*, ¶ 32; *Dollar Plus Stores, Inc. v. R-Montana Assoc., L.P.*, 2009 MT 164, ¶ 17, 350 Mont. 476, 209 P.3d 216; *Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 42, 336 Mont. 429, 154 P.3d 1189.

¶21 Section 85-2-306(3)(a)(iii), MCA, is one amongst several statutory exemptions to the water permit process and provides:

> When the appropriation is outside a stream depletion zone, is 35 gallons a minute or less, and does not exceed 10 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding 10 acre-feet, regardless of flow rate, requires a permit;

¶22 The statute thus allows an exemption from the permitting process and provides for a lawful appropriation when the amount of appropriation does not exceed 35 gallons per minute and 10 acre-feet per year. However, even if this criterion is satisfied, a combined appropriation from the same source of two or more wells or developed springs is "except[ed]" from the exemption if the combined appropriation exceeds 10 acre-feet per year, regardless of flow rate. The exception applies when (1) there are two or more wells

12

or developed springs, (2) that are from the same source, (3) where the combined appropriation exceeds 10 acre-feet per year. The exception removes any consideration of flow rate, but adds volume considerations when appropriations are from the same source, thus expressing the Legislature's intent to limit the impact of the appropriation that would occur on any particular source of water to less than 10 acre-feet per year.

¶23    To "appropriate" means to "divert, impound, or withdraw . . . a *quantity* of water for a beneficial use . . . ." Section 85-2-102(1), MCA (emphasis added). An appropriation refers to the amount of water one has the legal right to use as determined through the process sanctioned by the Act. "Combined" means "to bring into such close relationship as to obscure individual characters," to "merge," "intermix," "blend," or "unite into a single number or expression." Webster's Collegiate Dictionary 228 (10th ed. 1993). In § 85-2-306 (3)(a)(iii), MCA, "combined" is used as an adjective to modify the noun "appropriation" and therefore refers to the *combined quantity* of water which an appropriator has the legal right to use. The word "combined" does not precede "wells" or "developed springs" and therefore does not modify either form of ground development in a manner which would indicate a "combined well" or "combined developed spring," as Well Drillers contend. "In ascertaining plain meaning, we have 'long adhered to ordinary rules of grammar.'" *Bates v. Neva*, 2014 MT 336, ¶ 15, 377 Mont. 350, 339 P.3d 1265 (quoting *Thompson v. J.C. Billion, Inc.*, 2013 MT 20, ¶ 22 n. 5, 368 Mont. 299, 294 P.3d 397). *See also Jay v. Sch. Dist. No. 1 of Cascade Cnty.*, 24 Mont. 219, 225, 61 P. 250, 252 (1900)). Consistent with these common sense meanings and statutory definitions, § 85-2-306(3)(a)(iii), MCA, provides that a "combined appropriation" may not exceed

13

the *combined quantity* of 10 acre-feet per year, when there is more than one well or developed spring. Indeed, the very statutory definitions of "well," defined in § 85-2-102(31), MCA, as "an artificial opening or excavation in the ground . . .," and "developed spring," defined in § 85-2-102(11), MCA, as "any point where ground water emerges naturally, that has subsequently been physically altered, and from which ground water flows under natural pressures or is artificially withdrawn," suggest two or more distinct and unconnected things. We accordingly reject the Well Drillers' interpretation that "combined" modifies wells or developed springs; combined modifies appropriation, which speaks specifically to the *quantity* of water which may be withdrawn for a beneficial use.

¶24 Based upon the plain language of the statute, it is evident that the intent of the Legislature in enacting subsection (3)(a)(iii) was to ensure that, when appropriating from the same source, only a de minimus *quantity* of water, determined by the Legislature to be 10 acre-feet per year, could be lawfully appropriated without going through the rigors of the permitting process. An exception to the exemption for quantities exceeding 10 acre feet per year, regardless of flow rate and number of wells or developed springs utilized for the appropriation, protects other water rights utilizing the same water source. This is consistent with the purpose of the Act as a remedial statute designed to strictly adhere to the prior appropriation doctrine and to provide for the "administration, control, and regulation of water rights . . . and confirm all existing water rights . . . ." Section 85-2-101(2)(4), MCA. We have explained that "the Water Use Act was designed to protect senior water rights holders from encroachment by junior appropriators adversely

affecting those senior rights." *Mont. Power Co. v. Carey*, 211 Mont. 91, 98, 685 P.2d 336, 340 (1984). This fundamental purpose is reflected throughout the Act and many of the subsections of the Act begin with a policy declaration stating that the protection of senior water rights and the prior appropriation doctrine is the Act's core purpose. *See, e.g.*, § 85-1-101(4), MCA (the Act's purpose is to "protect existing uses"); § 85-2-101(4), MCA (it is "a purpose of this chapter to recognize and confirm all existing rights"); § 85-2-101(4), MCA (the purpose of permitting is to "provide enforceable legal protection for existing rights"). Accordingly, based upon the plain language of the statute and the stated purpose of the Act, we conclude that "combined appropriation" refers to the total amount or maximum quantity of water that may be appropriated without a permit and not to the manner in which wells or developed springs may be physically connected.

¶25 Although we have interpreted the plain language of § 85-2-306(3)(a)(iii), MCA, what remains to be addressed is the validity of the 1993 rule in light of the statute's plain meaning. When adopting a rule, the agency must comply with the requisites for rule validity codified in § 2-4-305(6), MCA, of the Montana Administrative Procedure Act. This section provides that "[w]henever by . . . statute a state agency has authority to adopt rules[,] . . . a rule is not valid or effective unless it is: (a) consistent and not in conflict with the statute; and (b) reasonably necessary to effectuate the purpose of the statute." Section 2-4-305(6), MCA. In interpreting the statute, we have stated:

> The courts have uniformly held that administrative regulations are "out of harmony" with legislative guidelines if they (1) "engraft additional and contradictory requirements on the statute" (citations omitted); or (2) if they

15

engraft additional, noncontradictory requirements on the statute which were not envisioned by the legislature. (citations omitted in original.)

*Board of Barbers v. Big Sky College*, 192 Mont. 159, 161, 626 P.2d 1269, 1270 (1981) (citation omitted). We have also held that "[r]ules adopted by administrative agencies which conflict with statutory requirements or exceed authority provided by statute, are invalid." *Haney v. Mahoney*, 2001 MT 201, ¶ 6, 306 Mont. 288, 32 P.3d 1254 (internal quotations omitted). *See also State ex rel. Swart v. Casne*, 172 Mont. 302, 564 P.2d 983 (1977) (holding agency rules void because a statute cannot be changed by administrative regulations), overruled on other grounds, *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, 315 Mont. 210, 69 P.3d 663. With these principles in mind, we must decide whether the 1993 rule defining the term "combined appropriation" is inconsistent with § 85-2-306(3)(a)(iii), MCA.

¶26 The 1993 rule defined "combined appropriation" as requiring that "the ground water developments" be "physically manifold into the same system."[2] First, there is no language anywhere in the Act which suggests that wells or developed springs must be physically manifold or connected in order to be deemed a "combined appropriation." We therefore conclude, without any difficulty, that the 1993 rule engrafted an additional requirement on the statute and must be deemed invalid if: (1) it is contradictory or inconsistent with the statute, or (2) adds a requirement not envisioned by the Legislature.

---

[2] No public hearing on this rule change adding a physical connectivity requirement was held and no public comments were received. The DNRC similarly did not provide a statement as to why the change from the 1987 rule was necessary as the DNRC was required to do pursuant to § 2-4-305, MCA. The DNRC responded to an inquiry by the Administrative Rules Committee that the 1987 definition of "combined appropriation" was "too ambiguous and therefore difficult to administer."

16

¶27 As the District Court correctly observed, the 1993 rule allows an unlimited quantity of water to be appropriated from the same source as long as the ground water developments are not physically manifold or connected. The 1993 rule, therefore, unquestionably expands the exemption by limiting the number of appropriations which must be excepted, rendering meaningless the underlying limit on volume or quantity of 10 acre-feet per year from the same source. That portion of § 85-2-306(3)(a)(iii), MCA, allowing for an exemption—a well or developed spring appropriating no more than 35 gallons per minute and 10 acre-feet per year—has no qualifying language relating to the same source. However, the exception to the exemption does; that is, regardless of flow rate and the number of wells or developed springs no combined quantity of water may exceed 10 acre-feet when it is from the same source. The 1993 rule directly contradicts this plain language by adding a connectivity requirement to the wells or developed springs, effectively swallowing up the underlying exception that the Legislature created.

¶28 We conclude that the 1993 rule was inconsistent with the plain language of § 85-2-306(3)(a)(iii), MCA, and that it engrafted an additional requirement on the exempt well statute that wells or developed springs be "physically manifold into the same system." By narrowing the exception to only those wells or developed springs physically connected, the 1993 rule expanded the narrow exemption to the permitting process provided by § 85-2-306(3)(a)(iii), MCA, and was inconsistent with the stated statutory purpose of the Act.

¶29 As a final matter, we think, in light of the several statutory amendments to § 85-2-306, MCA, it important to address a remaining argument of Well Drillers in

17

relation to the validity of the 1993 rule. Well Drillers argue that the Legislature abrogated the former meaning of "combined appropriation" when it imposed a volume limitation and lowered the flow rate in 1991 and added subsection (3)(a)(iv) to § 85-2-306, MCA, in 2013. Citing *Grenz v. Mont. Dept. of Natural Res. & Conservation*, 2011 MT 17, 359 Mont. 154, 248 P.3d 785, Well Drillers maintain that the 1993 rule represents a long-standing rule that has withstood numerous amendments and that this Court presumes the Legislature acts with knowledge of the prior construction of related rules and to have adopted that construction when amending statutes.

¶30 Preliminarily, we note that throughout the amendments, the text of the relevant clause of the statute has remained as originally enacted in 1987 continuing to its final amendment in 2013. Further, Well Drillers acknowledge that the Legislature could not have intended the term "combined appropriation" to denote physical connectivity when it added the term into the 1987 statute given the legislative debate surrounding incorporation of the term into the statute, that the statute did not contain a volume limitation, and the DNRC's immediate promulgation of the 1987 rule expressly stating that physical connectivity was not required. As the relevant text of the statute has remained unchanged, our conclusion that its plain language does not require physical connectivity applies for each statutory amendment. This conclusion remains valid even in light of the additional text and subsections to the statute made in 1993 and 2013. Nonetheless, Well Drillers argue legislative intent and *Grenz* support their interpretation that the statutory amendments incorporated the 1993 rule.

¶31 The Well Drillers' position ignores a common canon of statutory construction that "[w]ords and provisions used in the original act or section are presumed to be used in the same sense in the amendment." 1A Norman J. Singer, *Sutherland's Statutes and Statutory Construction*, § 22:33 (6th ed. 2002). And, in accordance therewith, courts "construe words in a new statute that are identical to words in a prior statute as having the same meaning." *Bakersfield Energy Partners, LP v. Comm'r*, 568 F.3d 767, 775 (9th Cir. 2009). Pursuant to § 1-2-203, MCA, where "a part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form, but the portions which are not altered are to be considered as having been the law from the time when they were enacted." Consistent with these principles, where a section of a statute has been amended but certain words have been left unchanged, we must accord the untouched provisions the meaning they had when they were originally incorporated into the statute. *See State ex rel. Montgomery Ward & Co. v. District Court*, 115 Mont. 521, 527, 146 P.2d 1012, 1014 (1944) (explaining that where the Legislature amended the statute but left in place the word "returned," it cannot be explained by new matter added years later, but rather must be interpreted as originally understood); *Northern Pacific Railway v. Dunham*, 108 Mont. 338, 346, 90 P.2d 506, 510 (1939), (explaining that "[b]y retaining the [particular] clause [in a statute] without any change, we must assume that the legislature intended that the words should be given the same meaning as they had at the time of the passage of [the original act]."

19

¶32  The parties do not dispute that when the term "combined appropriation" was first utilized by the Legislature it did not have the meaning the Well Drillers attach to it. Section 85-2-306(1), MCA (1987), provided:

> a combined appropriation from the same source from two or more wells or developed springs exceeding [100 gpm] requires a permit.

The 1991 amended statute, § 85-2-306(3)(a)(iii), MCA (1991), provided:

> a combined appropriation from the same source by two or more wells or developed springs exceeding [10 acre-feet] requires a permit.

Finally, the 2013 amended statute, § 85-2-306(3)(a)(iii), MCA (2013), provides:

> (iii) when the appropriation is outside a stream depletion zone, is 35 gallons a minute or less, and does not exceed 10 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding 10 acre-feet, regardless of the flow rate, requires a permit; or
>
> (iv) when the appropriation is within a stream depletion zone, is 20 gallons a minute or less, and does not exceed 2 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding this limitation requires a permit.

¶33  The Legislature retains power to abrogate an existing statutory interpretation. *See Langemo v. Mont. Rail Link, Inc.*, 2001 MT 273, ¶ 24, 307 Mont. 293, 38 P.3d 782. However, there is no indication that the Legislature intended to do so here. By leaving the term "combined appropriation" untouched, its original meaning was preserved. If the Legislature wished to abrogate that meaning, "it would have employed definite language in doing so, rather than to adopt the circuitous method suggested [by the Well Drillers] here." *Dunham*, 108 Mont. at 346, 90 P.2d at 510. The term "combined appropriation" utilized in the original 1987 statute has remained intact and unchanged in the subsequent statutory amendments of 1991 and 2013. When the 1987 Legislature incorporated the

20

disputed language into the statute, the 1991 Legislature adopted the former Legislature's original meaning by leaving the language in place.

¶34 Finally, *Grenz* does not support the Well Drillers' argument. In *Grenz*, we adopted the agency's interpretation of a statute and, in doing so, followed a well-known canon of statutory construction that provides that when the Legislature amends a statute we generally presume that it acts with knowledge of existing administrative rules interpreting the statute and adopts the agency's interpretation. *Grenz*, ¶ 41. Here, however, when the Legislature substantively amended § 85-2-306, MCA, in 1991, the then applicable administrative rule was the 1987 rule, which did not require physical connection between groundwater developments. Thus, following the above-referenced canon of construction used in *Grenz*—that the Legislature adopts an existing agency interpretation when it amends a statute—counsels against the Well Drillers' interpretation of the statute, not in favor of it.

¶35 We reject Well Drillers' argument that amendments to § 85-2-306, MCA, incorporated the 1993 rule. Such an argument is inconsistent with the plain language of the statute, the relevant portion of which has remained unchanged since 1987, and is likewise an incorrect application of § 1-2-203, MCA, and *Grenz*. The 1993 rule is invalid because it conflicts with the plain language of § 85-2-306, MCA, and because the Legislature, as is its prerogative, has not abrogated the original meaning it placed on "combined appropriation" since the legislature first incorporated the term in 1987.

21

¶36    *2. Whether the District Court erred by reinstating Admin. R. M. 36.12.101(7) (1987).*

¶37    The Well Drillers argue that the District Court erred by reinstating the 1987 rule after invaliding the 1993 rule, reasoning that the court lacked authority to reinstate the former rule. The Coalition counters that the proper course for the District Court was to reinstate the 1987 rule after invaliding the 1993 rule, reasoning that when an administrative rule is invalidated the effect should be, by default, to reinstate the former rule.

¶38    The issue of whether a former agency rule is reinstated by the invalidation of the current rule is a question of first impression for this Court. Federal law provides guidance on the subject. Under federal case law, the "effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005). Although the federal Administrative Procedure Act does not expressly state that the prior rule is reinstated, the "common rationale" for doing so is "that the current rule being invalid from its inception, the prior regulation is reinstated until validly rescinded or replaced." *Cumberland Med. Ctr. v. Sec'y of Health & Human Services*, 781 F.2d 536, 538 (6th Cir. 1986).

¶39    We find this reasoning persuasive. Like the federal Administrative Procedure Act, the Montana Administrative Procedure Act is silent in regard to the effect of the invalidation of the current rule on the former administrative rule. It serves to reason, however, that when a court invalidates the current rule, the effect is to return to the previous status of the law, which necessarily means in most instances that the former rule is reinstated.

22

¶40 We follow this same reasoning in the context of invalidated statutes. We have explained that an invalidated statute "is in reality no law, but is wholly void, and in legal contemplation is as inoperative as if it has never been passed." *State ex rel. Woodahl v. District Court*, 162 Mont. 283, 290, 511 P.2d 318, 322 (1973). The "natural effect of this rule is that the invalidity of a statute leaves the law as it stood prior to the enactment of the invalid statute." *Woodahl*, 162 Mont. at 291, 511 P.2d at 322. Thus, under Montana law, when an amended statute is invalidated the statute is left in the same position that it was in before the amendment was introduced. *In re O'Sullivan*, 117 Mont. 295, 304, 158 P.2d 306, 310 (1945).

¶41 We see nothing in the Montana Administrative Procedure Act that would argue against adopting the federal approach and the approach we utilize in the context of invalidated statutes. Therefore, we now hold that where, as here, a court invalidates an administrative rule that has been invalid since its inception, the default remedy is to reinstate the former administrative rule. Accordingly, the District Court did not err by reinstating the 1987 rule.

¶42 *3. Whether the District Court erred by directing the DNRC to institute rulemaking consistent with the court's order.*

¶43 The Well Drillers take issue with the portion of the District Court's order requiring that the DNRC conduct further rule making "consistent" with the court's order. Well Drillers argue that the court lacked authority to order that such rulemaking be "consistent" with its order because, in doing so, the court was directing the outcome of the rulemaking process.

23

¶44    We disagree with the Well Drillers that the District Court erred by requiring that any further rulemaking be done consistent with the court's order. The District Court is vested with judicial authority as set forth in Article VII, Section I of the Montana Constitution. That authority includes not only the power "to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), but also the power "to make binding orders or judgments." *State ex rel. Bennett v. Bonner*, 123 Mont. 414, 425, 214 P.2d 747, 753 (1950). The court must have authority to "pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision." *Shea v. N.-Butte Mining Co.*, 55 Mont. 522, 537, 179 P. 499, 504 (1919).

¶45    Although, the District Court did not err by requiring that a rule promulgated by the DNRC must be consistent with its order, it is the responsibility of the administrative agency to "adopt rules necessary to implement and carry out the purposes of this chapter." Section 85-2-113(2), MCA. Such authority includes whether, in the judgment of the DNRC, a rule other than the reinstated 1987 rule should be implemented. Accordingly, we reverse and remand to the District Court for the limited purpose of removing its mandate to the DNRC to initiate rulemaking. It is up to the DNRC to determine whether initiating rulemaking to change the reinstated 1987 rule is appropriate.

¶46    For the reasons stated, the judgment of the District Court is affirmed, with the exception of the requirement that the DNRC initiate rulemaking. The 1987 rule is reinstated until further action implementing a new rule is initiated by the DNRC.


                                        /S/ LAURIE McKINNON


                                        24

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA

Justice Jim Rice, dissenting.

¶47    Every judicial officer who has considered the subject statute has recognized the ambiguity inherent in the Legislature's employment of the term "combined appropriation" in this context. Addressing the ambiguity, the District Court considered legislative history, purposes of the iterations of the statute, water law commentaries, and the administrative record. The DNRC Hearing Examiner did the same and upheld the challenged administrative rule, concluding that "the most common definition [] of 'combined' is physically joined together. Therefore, the 'physically manifold' requirement under the administrative rule is not inconsistent or in conflict with the plain language of the statute, and certainly not plainly and palpably inconsistent with the statutory language." These analyses turned to interpretational guides because "[w]hen the legislative intent cannot be *readily derived* from the plain language, we review the legislative history and abide by the intentions reflected therein." *Montanans for Justice v. State*, 2006 MT 277, ¶ 60, 334 Mont. 237, 146 P.3d 759 (emphasis added). Everyone who has considered the statute—except the Court—has agreed: the subject statute is not clear and legislative intent cannot be "readily derived." However, the Court sweeps away the messy business of considering and analyzing the legislative record and history,

25

preferring instead to employ the *ipse dixit* canon of statutory construction: the statute is absolutely clear on its face because we say so.

¶48    Perhaps the reason for this is found in ¶ 13 of the Opinion. While this case is about the validity of an administrative rule, the Court is alarmed about the policy ramifications of the rule: that exempt appropriations "have grown steadily" and are "consuming significant amounts of water"; that it is anticipated that "appropriations will continue to grow rapidly"; that exempt appropriations will be added in "already over-appropriated basins"; that there are concerns that the "cumulative effects of these exempt appropriations are having a significant impact" on groundwater and surface flow levels; and that these appropriations "may be harming senior water users' existing rights." While it is always tempting to act decisively in response to a perceived policy problem, and to legislate a solution, legislating is neither our duty nor our prerogative. By deciding to solve the problem by simply declaring that the statute is unambiguous, and thus avoid the trouble of considering the troublesome history, the Court is holding that the DNRC inexplicably misinterpreted and misapplied a clear statute for the past 23 years, despite the fact the agency undertook rulemaking in 1993 for the very purpose of more accurately applying the statute and removing ambiguity in the former rule. Nobody has argued or even hinted at such a proposition, because nobody believes it.

¶49    The Well Drillers argue that "combined appropriation" plainly denotes a "physical connection" between two or more groundwater developments. The Coalition counters that "combined appropriation" clearly refers to groundwater developments that are used together for a "single beneficial use." The statute simply does not explain what level of

26

commonality between two or more groundwater developments is required before water withdrawn from the developments can fairly be said to be in "a state of unity"—as the word "combined" is defined in *The American Heritage Dictionary of the English Language* 368 (Joseph P. Pickett ed., 5th ed. 2011)—for purposes of the statute. The term "combined appropriation" could reasonably be understood, as the Well Drillers argue, to signify physical unity. Likewise, the term could reasonably be understood, as the Coalition argues, to signify only unity of use.

¶50 Accepting the reality that the statute is ambiguous, I would decide the case by employing the applicable canons of statutory construction. In the context of an ambiguous statute that has been subject to a longstanding interpretation by administrative rule, we apply the canon of deference to the agency's interpretation. *Mont. Trout Unlimited v. Mont. Dep't of Natural Res. & Conservation*, 2006 MT 72, ¶ 37, 331 Mont. 483, 133 P.3d 224. "[I]t is a well-accepted rule of statutory construction that the long and continued contemporaneous and practical interpretation of a statute by the executive officers charged with its administration and enforcement constitutes an invaluable aid in determining the meaning of a doubtful statute." *Mont. Power Co. v. Mont. PSC*, 2001 MT 102, ¶ 24, 305 Mont. 260, 26 P.3d 91 (internal quotations omitted) (citing *Bartels v. Miles City*, 145 Mont. 116, 122, 399 P.2d 768, 771 (1965)); *accord Molnar v. Fox*, 2013 MT 132, ¶ 27, 370 Mont. 238, 301 P.3d 824. When the interpretation has "stood unchallenged for *a considerable length of time*," it will be regarded as a "*great importance* in arriving at the proper construction of a statute." *Mont. Power Co.*, ¶ 24 (emphasis added) (quoting *Bartels*, 145 Mont. at 122, 399 P.2d at 771); *accord Mont.*

27

*Trout Unlimited*, ¶ 37.  Deference to the agency's interpretation is a form of estoppel, borne from the reliance by the "public and those having an interest in the interpretation of the law."  *Mont. Power Co.*, ¶ 24 (quoting *Bartels*, 145 Mont. at 122, 399 P.2d at 771); *accord D'Ewart v. Niebauer*, 228 Mont. 335, 340, 742 P.2d 1015, 1018 (1987).

¶51    This canon of deference is to apply "where the particular meaning of a statute has been placed in doubt, and where a particular meaning has been ascribed to a statute by an agency through *a long and continued course of consistent interpretation*, resulting in an identifiable reliance."  *Mont. Power Co.*, ¶ 25 (emphasis added).  The canon of deference to an agency's interpretation, rising to one of "great importance" when the interpretation is longstanding, yields only upon "compelling indications" that the construction is wrong. *Mont. Power Co.*, ¶¶ 23–25.

¶52    Whether an agency's interpretation of a statute is "longstanding" is not subject to a bright line test, but this case does not present a close call.  The 1993 administrative rule has been the law for 23 years now, which is more than sufficient time to be considered "a long and continued course of consistent interpretation."  *Mont. Power Co.*, ¶ 25.  For the same reason that a one-*year*-old administrative rule is clearly not "longstanding," *Mont. Trout Unlimited*, ¶ 38, a two-*decade*-old administrative rule clearly is.  Thus, unless there are "compelling indications" that DNRC's interpretation of the subject statute is wrong, the Court should defer to DNRC's interpretation of "combined appropriation."  *Mont. Power Co.*, ¶¶ 23, 25.

¶53    The genesis of this dispute is the agency's 1993 rulemaking, which, as explained by the Hearing Examiner, was undertaken to more concisely define the statutory term

28

"combined appropriation," and to remove ambiguity from the previous rule that rendered the statute "difficult to administer." In the many years that followed, review of the 1993 rule was undertaken by legislative committees, but no objection was made and no action was taken to alter the rule. This inaction corresponds to the purpose of the canon of construction mentioned above: the Legislature can act at any time it believes a rule is improper. Here, minor amendments were made to the statute over the years, but those did not involve the use of the term "combined appropriation." However, that changed in 2013, when the Legislature revisited the term.

¶54 Senate Bill 19, discussed below, and Senate Bill 346 were passed during the 2013 Legislative Session. Senate Bill 346 was entitled "An Act Generally Revising Water Laws Related to Ground Water Appropriations Exempt From Permitting." 2013 Mont. Laws 1796. Prior to the passage of Senate Bill 346, the relevant portion of the statute provided:

> (3)(a)(i) Except as provided in subsection (3)(a)(ii), outside the boundaries of a controlled ground water area, a permit is not required before appropriating ground water by means of a well or developed spring:
>
> (A) with a maximum appropriation of 35 gallons a minute or less, not to exceed 10 acre-feet a year, except that a combined appropriation from the same source from two or more wells or developed springs exceeding this limitation requires a permit;

Section 85-2-306(3)(a)(i)(A), MCA (2011). Senate Bill 346 made the following revisions to § 85-2-306, MCA, as indicated in the session law:[1]

---

[1] Section 5-11-205(2), MCA, provides that new parts of existing statutes are to be printed in a session law as italics, and deleted provisions are to be shown as stricken.

(3)(a)~~(i) Except as provided in subsection (3)(a)(ii), outside~~ *Outside* the boundaries of a controlled ground water area, a permit is not required before appropriating ground water by means of a well or developed spring:

~~(A) with a maximum appropriation of 35 gallons a minute or less, not to exceed 10 acre feet a year, except that a combined appropriation from the same source from two or more wells or developed springs exceeding this limitation requires a permit; or~~

~~(B)~~*(i)* when the appropriation is made by a local governmental fire agency organized under Title 7, chapter 33, and the appropriation is used only for emergency fire protection, which may include enclosed storage~~.~~*;*

*(ii) when a maximum appropriation of 350 gallons a minute or less is used in nonconsumptive geothermal heating or cooling exchange applications, all of the water extracted is returned without delay to the same source aquifer, and the distance between the extraction well and both the nearest existing well and the hydraulically connected surface waters is more than twice the distance between the extraction well and the injection well;*

*(iii) when the appropriation is outside a stream depletion zone, is 35 gallons a minute or less, and does not exceed 10 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding 10 acre-feet, regardless of the flow rate, requires a permit; or*

*(iv)  when the appropriation is within a stream depletion zone, is 20 gallons a minute or less, and does not exceed 2 acre-feet a year, except that a combined appropriation from the same source by two or more wells or developed springs exceeding this limitation requires a permit.*

~~(ii) Outside the boundaries of a controlled ground water area, a permit it not required before appropriating  ground water by means of a well or developed spring with a maximum appropriation of 350 gallons a minute or less for use in nonconsumptive geothermal heating or cooling exchange applications if all of the water extracted is returned without delay to the same source aquifer and if the distance between the extraction well and both the nearest existing well and the hydraulically connected surface waters is more than twice the distance between the extraction well and the injection well.~~

2013 Mont. Laws at 1799–800.

¶55  As part of its expressed intention to generally revise ground water appropriation laws, the 2013 Legislature expanded the use and purpose of the term, "combined appropriation." Whereas the term was used only once in pre-2013 law, the term was further employed in entirely new subsections that incorporated the concept of "stream depletion zones." As argued by the Well Drillers, "with the creation of § 85-2-306(3)(a)(iv), MCA, in 2013 and the inclusion of 'combined appropriation' language, it can very well be presumed that pursuant to *Grenz* [*v. Mont. Dep't of Natural Res. & Conservation*, 2011 MT 17, ¶ 41, 359 Mont. 154, 248 P.3d 785], the legislative intent included the use of the 1993 Rule's definition of the exempt well statute." This is correct: when the 2013 Legislature generally revised the statute, the applicable administrative rule was the agency's longstanding 1993 rule, which did not require physical connection between groundwater developments. By then, the 1993 rule had been in place for 20 years, and in accordance with the applicable canon of construction, "a particular meaning [had] been ascribed to [the] statute by an agency through a long and continued course of consistent interpretation, resulting in an identifiable reliance." *Mont. Power Co.*, ¶ 25. Thus, the 2013 Legislature, proceeding upon that "identifiable reliance," affirmatively employed the longstanding, 20-year agency interpretation of the statute.

¶56  The Court cites § 1-2-203, MCA, which provides that when a statute is amended, "the portions which are not altered are to be considered as having been the law from the time they were enacted, and the new provisions are to be considered as having been

31

enacted at the time of the amendment." The Court concludes that the 2013 general revision to the statute is an amendment that contains no "new" provisions. However, I would conclude Senate Bill 346's title, new language, and new structure demonstrate that, more than a mere amendment, a general revision was intended and enacted that incorporated the longstanding agency interpretation.

¶57 Canons of construction can be contradictory, and the particular canon that governs the interpretation of a given statute depends on the context. *See, e.g.*, *State v. Liefert*, 2002 MT 48, ¶ 26, 309 Mont. 19, 43 P.3d 329 (ambiguous criminal statutes to be interpreted in favor of defendant); *Eisenmenger v. Ethicon, Inc.*, 264 Mont. 393, 400, 871 P.2d 1313, 1317 (1994) (ambiguous statute of limitations to be interpreted to allow the longer period in which to prosecute the action); *Mont. Bankers Ass'n v. Mont. Dep't of Revenue*, 177 Mont. 112, 117, 580 P.2d 909, 912 (1978) (ambiguous tax statutes granting exemptions and deductions strictly construed against taxpayer); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 93–94, 122 S. Ct. 528, 535 (2001) (ambiguous statutes construed in favor of Indian nations). Here, the longstanding agency interpretation, followed by the confirming legislative history, shows that the canon of deference should be applied.

¶58 Although not necessary to the proper conclusion, the passage of Senate Bill 19 by the 2013 Legislature adds further impetus to accurately determining legislative intent. I find it significant that a bill was passed by both houses contemporaneously with the passage of Senate Bill 346, further defining the term at issue. The Court states the 2013 Legislature would have no reason to pass Senate Bill 19 if it had intended to adopt the

32

1993 rule within Senate Bill 346, because it would be redundant. However, the Legislature often uses multiple bills in a single session to deal with any given issue, and given that this litigation was pending, the 2013 Legislature's double-knotting of the issue makes perfect sense.

¶59 For the Court to insist that the 1991 Legislature's meaning of the term "combined appropriation" must be reinstated, regardless what occurred in the intervening years, restricts the power of the Legislature to subsequently amend the term, and grants a monopoly to the 1991 Legislature on this issue. This violates not only the canons of construction, but separation of powers. Further, legislative bodies cannot bind future legislative bodies in this way. *Ohio Life Ins. & Trust Co. v. Debolt*, 57 U.S. (16 How.) 416, 431, 14 L. Ed. 997, 1003 (1854) ("[N]o one legislature can, by its own act, disarm their successors of any of the powers or rights of sovereignty confided by the people to the legislative body, unless they are authorized to do so by the constitution under which they are elected."); *Newton v. Comm'rs*, 100 U.S. 548, 559, 25 L. Ed. 710, 711 (1879).

¶60 It is really not difficult to determine what the Legislature intends here, even if it is difficult for the Court to accept. The DNRC's two-decade-old administrative rule is a longstanding interpretation of a statute that is of "great importance" and should be given deference absent "compelling indications" that the interpretation is wrong. Because the 2013 Legislature clearly used the 1993 rule's definition of "combined appropriation" when it revised the statute in 2013, there are no compelling indications the 1993 rule is wrong. Indeed, the 1993 rule has been affirmed by the Legislature. Under that rule, many permits have been issued over the past 23 years. Given the ambiguity in the statute

and the DNRC's longstanding interpretation, this Court generally defers to the agency. I would do so, and reverse.


/S/ JIM RICE