FILED

01/02/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0268

DA 23-0268

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2025 MT 1

MONTANA TROUT UNLIMITED,
TROUT UNLIMITED, MONTANA
ENVIRONMENTAL INFORMATION
CENTER, EARTHWORKS, and
AMERICAN RIVERS,

       Petitioners and Appellants,

   v.

MONTANA DEPARTMENT OF NATURAL
RESOURCES AND CONSERVATION and
TINTINA MONTANA, INC.,

       Respondents and Appellees.

APPEAL FROM:    District Court of the Fourteenth Judicial District,
                    In and For the County of Meagher, Cause No. DV-2022-09
                    Honorable Michael B. Hayworth, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Sean M. Helle (argued), Jenny K. Harbine, Benjamin J. Scrimshaw,
           Earthjustice, Bozeman, Montana

           Patrick A. Byorth, Megan K. Casey, Trout Unlimited, Inc., Project,
           Bozeman, Montana

      For Appellee Montana Department of Natural Resources and Conservation:

           Brian C. Bramblett (argued), Molly Kelly, Montana Department of Natural
           Resources and Conservation, Helena, Montana

      For Appellee Tintina Montana, Inc.:

           W. John Tietz (argued), Hallee C. Frandsen, Browning, Kaleczyc, Berry &
           Hoven, P.C., Helena, Montana

For Amici Curiae Association of Gallatin Agricultural Irrigators, Montana Chamber of Commerce, Montana Farm Bureau Federation, Montana League of Cities and Towns, Inc., Montana Stockgrowers Association, and Montana Water Resources Association:

Ryan McLane, Franz & Driscoll, PLLP, Helena, Montana

Argued: March 29, 2024
Submitted on Briefs: April 16, 2024
Decided: January 2, 2025

Filed:

Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1 Montana Trout Unlimited, Trout Unlimited, Montana Environmental Information Center, Earthworks, and American Rivers (collectively "MTU" or "Appellants") appeal the order of the Fourteenth Judicial District Court, Meagher County, denying their petition for judicial review and affirming the Final Order issued by the Department of Natural Resource (DNRC) determining the scope of, and granting, a water use permit to Tintina Montana, Inc. (Tintina), for use in its mining operation. We consider the following issues:

> *1. Whether MTU has standing to object to DNRC's determination.*
>
> *2. Whether DNRC correctly categorized Tintina's removal of water from its mine and subsequent discharge of the water as neither a beneficial use nor a waste, which therefore fell outside the permitting process of the Montana Water Use Act.*
>
> *3. Whether DNRC interpreted the Montana Water Use Act in contravention of Article IX of the Montana Constitution.*

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Tintina, a mining company, seeks to operate a large underground copper mine, known as the Black Butte Copper Project (the Mine), located north of White Sulphur Springs in Meagher County. The entirety of the project is located within the watershed of Sheep Creek, which in turn, is a tributary of the Smith River. The Mine is also located within a subbasin of the Upper Missouri River, which is open to new surface water appropriations but provisionally closed to new groundwater appropriations and therefore necessitates that any new groundwater permit be accompanied by a mitigation plan in

3

accordance with § 85-2-360, MCA. Under this statute, the DNRC may issue a permit for a new groundwater use in a provisionally closed subbasin if it finds, *inter alia*, that the applicant has prepared a hydrogeologic report assessing the effects of the proposed groundwater appropriation on hydrologically connected surface sources, and, if that report shows there will be a net depletion of surface water, that the applicant has prepared a mitigation plan capable of offsetting the effects of net depletion of the new appropriation on existing surface water users. *See* §§ 85-2-360, -362, MCA.

¶4 Because the Mine will be underground, substantial quantities of groundwater will infiltrate the Mine, interfering with mining activity. To address this problem, Tintina anticipates needing to remove about 807 acre-feet of water from the Mine annually. Of that water, Tintina intends to utilize approximately 350 acre-feet in its mining operation. The remaining 457 acre-feet (Remainder Water) will not serve any purpose in Tintina's mining operation. Tintina proposed to treat the Remainder Water and return it to the underground aquifer. The Remainder Water would be treated at an on-premises water facility and then placed in an underground infiltration gallery constructed by Tintina. The infiltration gallery would be located to return the Remainder Water to the aquifer underlying the Sheep Creek alluvium. During the treatment process, to comply with seasonal surface-water standards, the Remainder Water would be held in treatment ponds from July to September.

¶5 In September 2018, Tintina submitted a package of permit and change applications to the DNRC pursuant to the Montana Water Use Act (MWUA or the Act). One of the

4

applications sought approval of what became Permit No. 41J-30116562 (Application).[1] The Application proposed, as described above, the use of 350 acre-feet of groundwater for Tintina's mining operation, and the removal of the remaining 457 acre-feet of groundwater from the mine, called "mine dewatering," and return of that water to the ground aquifer. The Application included a mitigation plan to offset the impact upon senior water right holders of Tintina's proposed use within its mining operation of the 350 acre-feet of extracted water, as required by MWUA, given the Mine's location within the closed Upper Missouri River basin. Under the mitigation plan, Tintina is required to obtain and provide sufficient water to offset any loss to senior rights holders on Coon and Sheep Creeks year-round, and Black Butte Creek seasonally. Tintina proposed to obtain that water from a combination of consumptive use reductions in several irrigation rights and Tintina's permitted appropriation of high spring flows, which water would be stored in a 292 acre-foot reservoir that would allow for timely release to offset any of Tintina's depletions to surface water.

¶6     Following its review of the Application, DNRC issued a Preliminary Determination to Grant Tintina's application for a beneficial use permit to use 350 acre-feet of the removed water, including extensive findings of fact and conclusions of law in categories addressing

---

[1] Tintina also applied for a water appropriation that ultimately became Permit No. 41J-30116563, which is related to the Permit in this appeal, but not at issue here. Tintina proposed therein to capture high spring flows from Sheep Creek at a flow rate of 7.5 CFS to store up to 291.9 AFY in an off-stream reservoir, and to use the water for wetland maintenance and mitigation purposes. The conditions for this permit were adjusted pursuant to the parties' stipulated settlement, discussed herein.

Concurrent Proceedings, Proposed Appropriation, Basin Closure, and Beneficial Water Use Permit Criteria, which encompassed physical availability, legal availability, adverse effect, adequate diversion, possessory interest, and beneficial use. Upon these findings and conclusions, the Preliminary Determination concluded that Tintina had satisfied all criteria under the MWUA for issuance of a permit. MTU filed objections to the Preliminary Determination, challenging the determinations regarding legal availability and adverse effect as to the applications for both 41J-30116562 (the permit at issue here) and 41J-30116563, the issue of beneficial use regarding 41J-30116562, and the issues of physical availability and adequacy of diversion for 41J-30116563. Among other arguments, MTU contended that Tintina was also required to obtain a beneficial use permit for the Remainder Water that Tintina proposed to return to the aquifer. In accordance with the Montana Administrative Procedure Act (MAPA), a contested case proceeding was conducted before a Hearing Examiner. Both Tintina and MTU moved for partial summary judgment on the issue of whether the Remainder Water required a beneficial use permit under the MWUA. The DNRC took the position that the Remainder Water could not be permitted under the MWUA and fell within the regulatory jurisdiction of the Department of Environmental Quality (DEQ). Tintina similarly argued that a beneficial use permit was not required under the plain language of the MWUA, while MTU contended that DNRC's categorization of mine dewatering as outside the scope of MWUA conflicted with the framework of the MWUA when read in conjunction with Article IX of the Montana Constitution. It argued that the constitutional provisions "dictate an interpretation of the

6

Water Use Act that facilitates *comprehensive regulation* and reasonable conservation of the State's valuable and often scarce water resources." (Emphasis added.) Therefore, the "use" of water should fall within one of just two categories, either beneficial use or waste, and because the MWUA provides that mine dewatering was categorically not waste, such water should be considered a beneficial use.

¶7 In a February 23, 2022 Order on Cross-Motions for Partial Summary Judgment, the Hearing Examiner granted summary judgment on this issue to Tintina. The Hearing Examiner explained that the "distinction drawn by the DNRC in regard to the Application—that there are certain uses of water that neither rise to the level of beneficial use nor constitute waste but rather fall into a category that is wholly beyond the scope of the Water Use Act's regulatory scheme—is not a new one. Rather, it is one DNRC has drawn consistently for decades." The Hearing Examiner cited to several prior DNRC decisions, noting that, in one such case, *In re Application for Beneficial Water Use Permit No. 24591-g41H by Kenyon-Noble Ready Mix Co.* (DNRC 1981) (*Kenyon-Noble*), "the DNRC specifically considered and rejected an argument similar to one [the Objectors] bring here, namely that the specific exclusion of mine dewatering operations from the statute prohibiting the waste of groundwater perforce means that such drainage must be considered a beneficial use requiring a permit." The Hearing Examiner noted that the Objectors had not identified any case in which DNRC had taken a different position, and that the Hearing Examiner was not aware of any such cases. The Hearing Examiner summarized the issue as, "[i]f the presence of water is the problem and not the solution, then we are not in the

realm of water rights," and explained that Tintina's position on the Remainder Water was supported by the longstanding interpretation of the agency, which had never been altered by legislative action:

> For over 40 years, DNRC has consistently taken the position that mine dewatering standing alone is neither a beneficial use of water nor, pursuant to § 85-2-505(1)(c), MCA, waste. Rather it is a manipulation of water wholly outside the scope of the Water Use Act's permitting scheme. The Legislature has not seen fit in that time to modify or disavow this interpretation.

¶8 Thereafter, Tintina and MTU entered a stipulation "for the purpose of resolving objections" to Tintina's beneficial water use permit applications (the Stipulation). Pursuant thereto, Tintina agreed to add water flow rate gauges on impacted waterbodies, located as negotiated with MTU, track daily diverted volumes of groundwater, implement additional year-round mitigation measures for Black Butte Creek, and modify Tintina's accompanying Application for Permit No. 41J-30116563 to reflect flow rates as recommended by MTU. In return, MTU agreed to withdraw all of its objections to Tintina's Application except for appeal of the Hearing Examiner's partial summary judgment order on the Remainder Water issue. Upon the entry of the Stipulation, the Hearing Examiner issued the Final Order, explaining that its approval of the conditions within the Stipulation was required under Admin. R. M. 36.12.207(1), and granting the same, approving the Application for Permit No. 41J-30116562 subject to the stipulated conditions. The Hearing Examiner noted that MTU's objections to the Application had been deemed withdrawn, but that MTU was not precluded from appealing the February 23, 2022 Order, and also noted that all other objectors, including senior appropriators, had agreed with entry of the Final Order.

8

¶9      MTU petitioned the District Court for judicial review of the Final Order on the Remainder Water issue.  Regarding the interpretation of the MWUA, MTU argued that DNRC was incorrect to classify the Remainder Water as neither beneficial use nor waste. MTU argued that, because the statutory exemption of mine dewatering from "waste" includes "the disposal of ground water without *further* beneficial use," § 85-2-505(1)(c), MCA (emphasis added), it was implied that mine dewatering must necessarily be a beneficial use in the first instance, allowing a mine operator to dispose of such water only after first obtaining a permit to use it.  The District Court rejected this statutory argument, reasoning that the statutory exemption of mine dewatering from the category of "waste" does not, by itself, "bootstrap the practice" of mine dewatering "into the permitting process," and concluded that "[m]ine dewatering is neither a 'beneficial use' of water nor, pursuant to § 85-2-505(1)(c), MCA, a 'waste.'"  The District Court further reasoned that, to the extent there is any doubt in the statute's interpretation, DNRC's long-standing interpretation of the Water Use Act reflected the intention of the Legislature and was entitled to deference.

¶10     Alternatively, MTU contended that if DNRC's interpretation of MWUA was correct, then the Act had created an unconstitutional "loophole" that exempted mine dewatering from the permitting process because the statute would fail to "provide for the administration, control, and regulation of water rights" and to "provide adequate remedies to prevent unreasonable depletion and degradation of natural resources." Mont. Const. art. IX, §§ 1(3), 3(4).  Reasoning that MTU was suggesting "that DNRC has a constitutional mandate to

9

comprehensively manage water resources," which "seems to advocate for DNRC to exercise regulatory authority beyond the Water Use Act," the District Court rejected MTU's arguments based upon this Court's decision in *Clark Fork Coalition v. Mont. Dep't of Natural Res. & Conservation*, 2021 MT 44, 403 Mont. 225, 481 P.3d 198 (*Clark Fork*), noting that this Court had distinguished the purposes of MWUA from the purposes of the Montana Environmental Protection Act (MEPA), the Montana Water Quality Act (MWQA), and, at issue there, the Montana Metal Mine Reclamation Act (MMRA), and quoted from that decision as follows:

> [Unlike with MEPA, the MWQA, and pertinent provisions of the MMRA,] the Legislature did not enact the [MWUA] for the primary purpose of implementing, satisfying, or tailoring it to its environmental protection duty under Montana Constitution Article II, Section 3, and Article IX, Section 1. *See* § 85-2-101, MCA. *Compare* §§ 75-1-102, 75-5-102, and § 82-4-301, MCA. The Legislature enacted the [MWUA] for the specific purpose of implementing and fulfilling its separate duty under Article IX, Section 3 (in re state ownership of Montana waters and state "administration, control, and regulation of water rights" under a centralized water rights administration and records system). Section 85-2-101, MCA.

> While the [MWUA] also has a secondary stated purpose (i.e. to "provide for the wise utilization, development, and conservation" of state waters "for the maximum benefit" of Montanans "with the least possible degradation of the natural aquatic ecosystems"), the Legislature served that secondary purpose, extraneous and without reference to its Article IX, Section 1 environmental protection duty, by providing for discretionary objection by [MDEQ] or a water quality district. *See* §§ 85-2-101(3), -311(1)(g), and (2), MCA.

Consequently, the District Court concluded that the MWUA was not rendered unconstitutional by not permitting mine dewatering because, under *Clark Fork*, the purpose

10

of MWUA is to regulate water rights based upon beneficial uses, not to regulate the water resource itself.

¶11    MTU appeals.

## STANDARDS OF REVIEW

¶12    In contested cases involving final agency decisions, the Montana Administrative Procedure Act (MAPA) governs judicial review. Section 2-4-702, MCA. In pertinent part, MAPA provides:

> The court may reverse or modify the [agency's] decision if substantial rights of the appellant have been prejudiced because:
>
> (a) the administrative findings, inferences, conclusions, or decisions are:
> (i) in violation of constitutional or statutory provisions;
> (ii) in excess of the statutory authority of the agency;
> (iii) made upon unlawful procedure;
> (iv) affected by other error of law;
> (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
> (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Section 2-4-704(2)(a), MCA.

¶13    Summary judgment is appropriate where there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). This Court reviews de novo a district court's grant of summary judgment, using the same standards applied by the district court under M. R. Civ. P. 56. *Smith v. BNSF Ry.*, 2008 MT 225, ¶ 10, 344 Mont. 278, 187 P.3d 639. Additionally, we review district court conclusions and applications of law de novo for correctness. *Clark Fork*, ¶ 32. As conclusions of law,

interpretations and applications of constitutional and statutory law are therefore reviewed de novo for correctness. *Clark Fork*, ¶ 32. When reviewing agency decisions for correctness, we "defer to agency interpretations of its own rules or regulations that fall within a reasonable range of interpretation." *Mont. Env't Info. Ctr. v. Westmoreland Rosebud Mining, LLC*, 2023 MT 224, ¶ 10, 414 Mont. 80, 545 P.3d 623. "Where an agency's interpretation has stood unchallenged for a considerable length of time, it will be regarded as a great importance in arriving at the proper construction." *Glendive Med. Ctr. v. Mont. Dep't of Pub. HHS*, 2002 MT 131, ¶ 14, 310 Mont. 156, 49 P.3d 560 (citing *Mont. Power Co. v. Mont. PSC*, 2001 MT 102, ¶ 24, 305 Mont. 260, 26 P.3d 91). "[T]he test of time and reliance may nevertheless yield to a judicial determination that construction is nevertheless wrong, based on 'compelling indications.'" *Mont. Power Co.*, ¶ 25 (citation omitted).

¶14 "A statute is presumed constitutional unless it conflicts with the Montana Constitution, in the judgement [sic] of the [C]ourt, beyond a reasonable doubt. Further, the party challenging the constitutionality of the statute bears the burden of proof, and if any doubt exists, it must be resolved in favor of the statute." *State v. Akhmedli*, 2023 MT 120, ¶ 3, 412 Mont. 538, 531 P.3d 562 (quoting *Mont. Indep. Living Project v. State, DOT*, 2019 MT 298, ¶ 14, 398 Mont. 204, 454 P.3d 1216) (internal quotations omitted). "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, *not to insert what has been omitted* or to omit what has been inserted." Section 1-2-101, MCA (emphasis added).

12

**DISCUSSION**

¶15    *1. Whether MTU has standing to object to DNRC's determination.*

¶16    Tintina raises for the first time on appeal the Appellants' standing to challenge DNRC's permitting decision, given that the MWUA specifically regulates water rights, but none of the Appellants, including MTU, possess a senior water right that could be impacted by DNRC's permitting decision.  MTU rebuts this argument on two bases:  1) Tintina did not previously raise the issue of MTU's standing and therefore failed to preserve the issue for appeal; and 2) MTU has standing on the basis that its members, predominantly recreational anglers, uniquely utilize the publicly owned in-stream flow rights in the Smith River, which sustain the river's fish population.

¶17    The question of standing is meant to resolve whether the complaining party is the proper party to seek adjudication of the contested issue.  *Mont. Trout Unlimited v. Beaverhead Water Co.*, 2011 MT 151, ¶ 27, 361 Mont. 77, 255 P.3d 179 (*Beaverhead*).  "The test of standing is that the complaining party must clearly allege past, present or threatened injury to a property or civil right, and the alleged injury must be distinguishable from the injury to the public generally, but it need not be exclusive to the complaining party."  *Beaverhead*, ¶ 27.

¶18    In general litigation, a challenge to standing may be raised for the first time on appeal.  *Baxter Homeowners Ass'n v. Angel*, 2013 MT 83, ¶ 14, 369 Mont 398, 298 P.3d 1145 ("The question of standing is an exception to the general rule that we will not address issues not properly preserved for appeal.").  However, that rule is altered in the context of

13

MAPA litigation. "Because the Legislature created judicial review of administrative decisions and at the same time limited the scope of review, the general rule that justiciability questions can be raised at any time is not applicable" in MAPA cases. *Hilands Golf Club v. Ashmore*, 2002 MT 8, ¶ 21, 308 Mont. 111, 39 P.3d 697. Consequently, "standing and mootness claims cannot be raised for the first time on judicial review of an administrative agency decision" unless the court determines there was "good cause for the party's failure to raise the question before the agency." *Hilands Golf Club*, ¶ 21.

¶19 While arguing that Appellants' claimed injuries are too attenuated to establish standing under the purposes of the MWUA, that is, the administration of water rights and protection of senior rights, Tintina does not provide an argument that demonstrates good cause for its failure to raise the issue before the agency. Therefore, pursuant to this Court's interpretation of MAPA, we will give no further consideration to the question. *See Hilands Golf Club*, ¶ 28.

¶20 *2. Whether the DNRC correctly categorized Tintina's removal of water from its mine and discharge of the water as neither a beneficial use nor a waste, which therefore fell outside the permitting process of the Montana Water Use Act.*

¶21 The MWUA provides that "a person may not appropriate water except as provided in this chapter. A person may appropriate water only for a beneficial use." Section 85-2-301(1), MCA. To "appropriate" water is "to divert, impound, or withdraw, including by stock for stock water, a quantity of water for a beneficial use." Section 85-2-102(1)(a), MCA. In turn, "beneficial use" is defined as "a use of water for the benefit of the appropriator, other persons, or the public, including but not limited to agricultural, stock

14

water, domestic, fish and wildlife, industrial, irrigation, mining, municipal, power, and recreational uses." Section 85-2-102(5)(a), MCA. Upon submission of an application for a water use permit, the DNRC will assess whether the applicant has satisfied each of the statutory criteria, including that the water will be appropriated for a beneficial use.[2] *See* § 85-2-311(1), MCA; *Flathead Lakers Inc., v. Mont. Dep't of Nat. Res. & Conservation*, 2023 MT 85, ¶ 38, 412 Mont. 225, 530 P.3d 769.

¶22    In contrast, "waste" of water is defined by the MWUA as "the unreasonable loss of water through the design or negligent operation of an appropriation or water distribution facility or the application of water to anything but a beneficial use." Section 85-2-102(27), MCA. Waste of groundwater is prohibited by the Act. *See* § 85-2-505, MCA ("No ground water may be wasted."). Without more, the definition of "waste" as "the application of water to anything but a beneficial use," § 85-2-102(27), MCA, may well require the DNRC to administrate within two binary water categories: waste and beneficial use. However, the MWUA does not stop there, and the recognition of water outside of these binary categories is reflective of many years of precedent and practice.

¶23    The MWUA describes several circumstances where "the withdrawal or use of ground water may not be construed as waste." Section 85-2-505(1), MCA. These include the circumstance, at issue here, of "the disposal of ground water without further beneficial use

---

[2] These criteria include, among others, the physical and legal availability of the water, its beneficial use, and the lack of adverse effect on senior water right holders. *See* § 85-2-311(1), MCA.

that must be withdrawn for the sole purpose of improving or preserving the utility of land by draining the same or that must be removed from a mine to permit mining operations or to preserve the mine in good condition." Section 85-2-505(1)(c), MCA.

¶24 The Hearing Examiner concluded that Tintina's removal and disposal of the Remainder Water did not constitute a "use" because the water was not being applied to any beneficial purpose, and did not constitute a "waste" because mine dewatering is categorically exempt from the statutory definition of waste. Section 85-2-505(1)(c), MCA. On appeal, MTU furthers its interpretational argument that MWUA necessarily categorizes mine dewatering as a beneficial use because § 85-2-505(1)(c), MCA, which defines mine dewatering to include "the disposal of ground water *without further beneficial use* . . . that must be removed from a mine to permit mining operations" (emphasis added), implies that the dewatering itself is a beneficial use that must be permitted before Tintina can return the water to the ground aquifer. The Department and Tintina argue in favor of the Hearing Examiner's conclusions. Amici argue that MTU is asking this Court "to fundamentally reinterpret the foundational basis of every water right in Montana: 'beneficial use,'" which would "require thousands of otherwise legal manipulations of water to obtain a water right, even when there is no use of water."[3]

---

[3] The Amici have filed a joint brief, and include the Montana League of Cities and Towns, Association of Gallatin Agricultural Irrigators, Montana Chamber of Commerce, Montana Farm Bureau Federation, Montana Stockgrowers Association, and Montana Water Resources Association.

¶25  MTU's argument is contradicted by DNRC administrative decisions applying the Act, and other authority, on which the Hearing Examiner relied. The 1981 *Kenyon-Noble* decision involved an applicant, Kenyon-Noble Ready Mix Co. (Kenyon-Noble), which proposed to dewater its gravel pit and sought a permit to beneficially use a portion of the extracted groundwater to wash gravel. Like the proposal here, Kenyon-Noble also proposed to place remaining or excess extracted water into settling ponds "as part of its system for returning waters to the source of the supply." *Kenyon-Noble*, at 1. The Hearing Examiner held that the remaining extracted water did not constitute "waste," because it fell within the exception set out in § 85-2-505(1)(c), MCA, but did not constitute a "beneficial use" either, because "the mere absence of waste does not inevitably indicate a beneficial use." *Kenyon-Noble*, at 3. The Hearing Examiner reasoned that the phrase "without further beneficial use" in § 85-2-505(1)(c), MCA, "serves to highlight a legislative intention that waters withdrawn and subsequently used for beneficial purposes should be treated as traditional appropriations," while waters simply removed without such subsequent beneficial use were not subject to the traditional appropriation process. *Kenyon-Noble*, at 3. The Hearing Examiner explained:

> [T]he fundamental focus of the appropriative system is upon a bona fide use for the claimed resource. Thus, the exception of drainage practices incident to mining operations from the statutory ban against waste does not by its terms transform such practices into appropriations governed by the permitting process. The permit system merely details a procedural mechanism whereby certain threshold determinations may be made for various appropriations. It is still incumbent upon water users to protect and defend their own property interests. Thus, the mere fact that the legislature has not delegated authority to the Department to assess drainage practices does not work substantial

17

> prejudice to any potentially affected persons.  Rather, it leaves them where they have historically and traditionally been.

*Kenyon-Noble*, at 3-4 (internal citations omitted).  Accordingly, Kenyon-Noble was granted a beneficial use permit for the water it removed and beneficially used to wash gravel, but was not required to permit the extracted water that it removed and placed in settling ponds for return to the water supply.

¶26    In December of 1981, following the *Kenyon-Noble* decision, DNRC adopted a written Dewatering Policy to address when the permit application process is required in cases of manipulated water.  *Administrative Policy No. 7*, Water Rights Bureau New Appropriations Program (DNRC 1981) (the Policy).  The Policy defined "dewatering" as "the process whereby water (usually groundwater) from surrounding aquifers must be removed by pumping or gravity flow so another activity can go on, such as, mining, agriculture, etc."  Noting that Art. IX, Sec. 3(3), of the Montana Constitution provided that the State's waters "are subject to appropriation for beneficial uses as provided by law," and the Legislature's enactment of the MWUA pursuant thereto, including provisions defining beneficial use, waste, and exemptions from waste, the Policy stated that a permit application process is not required "where there is no intent to apply any of the water to a beneficial use," and that "[t]he mere dewatering of a water source without a beneficial use does not constitute an appropriation; therefore, no water right can be established solely by dewatering."  The Policy stated that the MWUA recognized certain circumstances "when groundwater is not being put to a beneficial use [but] is not a waste," and provided examples,

18

such as "[w]ater withdrawn from a mine for the purpose of extracting some mineral," "[w]ater withdrawn by means of an open drain ditch for the purpose of draining a field to make it more productive," and "[w]ater withdrawn from a reservoir, lake or pond for the purpose of regulating the water level, draining for repairs or construction."

¶27    In *In re Applications for Beneficial Water Use Permits 41T-104524, 41T-104526, 41T-104527 by CR Kendall Co.* (DNRC 1999) (*CR Kendall*), Applicant CR Kendall Corporation proposed to operate a pump-back water treatment system at its mine to capture water contaminated from mine tailings and divert it away from an at-risk river. *CR Kendall*, at 1. The water would be pumped into the mine's water containment system where it would be disposed by evaporation and irrigation. CR Kendall initially applied for a beneficial use permit for the water, but during the proceeding changed its position with regard to the need to do so, offering that because it did not intend to gain any benefit from application of the water, this manipulation did not constitute a beneficial use requiring a permit. The Hearing Examiner agreed, concluding:

> [The] disposal of contaminated water is not a use of water in which a property interest is necessary to achieve a legal objective (hereinafter termed a non-use of water). Consequently, such a non-use of water is not entitled to water rights protection under the prior appropriation doctrine embodied in the Montana Water Use Act of 1973 and does not fall within the jurisdiction of the DNRC permitting process.
>        The DNRC is the regulator of water rights, not the regulator of water disposal.

*CR Kendall*, at 4-5. The Hearing Examiner relied upon *West Side Ditch Co. v. Bennett et al.*, 106 Mont. 422, 78 P.2d 78 (1938), wherein this Court concluded that no property

19

interest existed in water drained from swampy farmland via a constructed ditch because the mere diversion of the water did not constitute a beneficial use. The Hearing Examiner also cited *In the Matter of the Petition for Declaratory Judgment the City of Deer Lodge, No. 97514-76G* (DNRC 1996), wherein the DNRC concluded that the City of Deer Lodge's disposal of sewer water through irrigation did not constitute a beneficial use because the intent of the manipulation was not to produce crops, but merely to discharge the sewage away from a nearby river. "Trimmed to its essence," the Hearing Examiner reasoned, "the *Deer Lodge* holding is simply that water disposal is not water usage." Acknowledging the opponents' argument that CR Kendall's proposal for disposing of water was related to and would benefit its operation of the mine, the Hearing Examiner reasoned:

> The essential issue here, however, is not whether Applicant's diversion is beneficial or related to mining. Obviously, the pump-back system is related to mining activities and must benefit Applicant in some way. Otherwise, Applicant would not operate the system. The issue rather is whether Applicant's diversion is a use of water in the first place. Disposal of water would not seem to be a use of water.

*CR Kendall*, at 9. Accordingly, CR Kendall was not required to obtain a beneficial use permit for the disposal of water from its gravel mine.

¶28 These agency decisions reflect longstanding common law principles governing water rights. "*[B]eneficial use* shall be the *basis*, the *measure* and the *limit* of all rights to the use of water." *McDonald v. State*, 220 Mont. 519, 530, 722 P.2d 598, 605 (1986) (emphasis in original). "[A]pplication to a beneficial use is the touchstone of the appropriation doctrine." *Curry v. Pondera Cnty. Canal & Reservoir Co.*, 2016 MT 77, ¶ 87, 383 Mont. 93, 370 P.3d

20

440 (citing *In re Adjudication of Existing Rights to the Use of all Water*, 2002 MT 216, ¶ 10, 311 Mont. 327, 55 P.3d 396.). "[A]s every appropriation must be made for a beneficial use or useful purpose, it becomes the duty of the courts to try the question of the claimant's intent by his acts and the circumstances surrounding his possession of the water, its actual or contemplated use and the purposes thereof." *Toohey v. Campbell*, 24 Mont. 13, 17-18, 60 P. 396, 397 (1900). The Department argues that MTU's "attempt to manufacture incidental beneficial uses to justify its reading of the law is misplaced," citing another early holding that addressed intent regarding diverted water in excess of the amount beneficially used:

> [The appropriator] may divert more water than is necessary for domestic and culinary purposes, and permit the excess to flow on down to his lands; but if he has no intention of using such excess to irrigate the land upon which the excess so runs, and his purpose is not to raise a crop or run machinery, or to mine, or to otherwise apply it to a useful purpose, he acquires no valid right to such excess by the mere fact of a diffusion of waste water upon the grounds, even though they be susceptible of cultivation. *The intention of the claimant is therefore a most important factor in determining the validity of an appropriation of water.*

*Power v. Switzer*, 21 Mont. 523, 529-30, 55 P. 32, 35 (1898) (emphasis added).

¶29 As noted above, courts will "defer to agency interpretations of its own rules or regulations that fall within a reasonable range of interpretation." *Mont. Env't Info. Ctr.*, ¶ 10. We have explained that this rule applies "where a particular meaning has been ascribed to a statute by an agency through a long and continued course of consistent interpretation, resulting in an identifiable reliance." *Mont. Power Co.* ¶ 25; *see also Glendive Med. Ctr.*, ¶ 14 ("Where an agency's interpretation has stood unchallenged for a

21

considerable length of time, it will be regarded as a great importance in arriving at the proper construction."). In balance, we also recognize that "the test of time and reliance may nevertheless yield to a judicial determination that [an agency's] construction is nevertheless wrong, based on 'compelling indications.'" *Mont. Power Co.*, ¶ 25 (citation omitted). DNRC's interpretation of its duties under the subject provision of the MWUA has remained consistent in the 43 years since *Kenyon-Noble* and at no point has the Montana Legislature stepped in to modify DNRC's categorization of mine dewatering as neither "waste" nor "use," despite specific opportunities to do so. As explained by the Department, legislative committees have received testimony regarding the Department's statutory interpretation that mere manipulations of water do not require and, indeed, do not qualify for, a beneficial use permit. *See* Hearing on H.B. 178, Natural Resources Committee, 59th Montana Legislature (2005), Testimony of Jack Stults, Administrator, DNRC Water Resources Division ("a person who digs a drain ditch to remove water and doesn't use it for any other purpose does not need a water right.").

¶30 DNRC's decision to approve Tintina's plan for mine dewatering and subsequent disposal is consistent with its decisions in *Kenyon-Noble* and *CR Kendall*. As in *Kenyon-Noble*, Tintina intends to use a portion of the water extracted from the mine, while returning the remainder to the aquifer; as in *CR Kendall*, the purpose of Tintina's

manipulation of the excess extracted water, or Remainder Water, is merely to remove it from the mine, not to employ the water for a further beneficial purpose.[4]

¶31　That Tintina's mine dewatering is statutorily exempted from "waste" does not require classification of the dewatering as a "beneficial use."  The phrase "without further beneficial use" within § 85-2-505(1)(c), MCA, does not "work a transformation," in the words of the *Kenyon-Noble* Hearing Examiner, of dewatering into an appropriation, but rather distinguishes extracted water that is put to a beneficial use, such as the 350 acre-feet which is subject to Tintina's beneficial use application, from water that is extracted "*for the sole purpose* of improving or preserving the utility of land by draining the same or that must be removed from a mine to permit mining operations or to preserve the mine in good condition." Section 85-2-505(1)(c), MCA (emphasis added).  Under both DNRC's statutory

---

[4] The Dissent cites to the ruling in *Diamond Cross Props. v. Mont.*, 2008 Mont. Dist. LEXIS 180, 2008 WL 3243320 (July 14, 2008).  Dissent, ¶ 60.  MTU Objectors likewise cited to *Diamond Cross*, a state district court decision, in support of its motion for summary judgment before the Hearing Examiner, who discussed the case at length, noting that the District Court there actually agreed with the distinction made by DNRC between the beneficial use of water and other water manipulation, in cases such as *Kenyon-Noble* and *CR Kendall*.  *See Diamond Cross Props.*, at 6 ("for over 25 years, DNRC has taken the position that the extraction of water that is not needed or desired for a beneficial use, but is merely disposed of as a by-product of other activities, does not constitute a beneficial use of water requiring a beneficial water use permit . . . . [E]xamples include the dewatering of a gravel pit, the removal of contaminated water from a mining operation, and the land application of sewage effluent by a municipality.  The Court does not dispute the DNRC's position in the context of the referenced examples.  Indeed, the rulings made by the DNRC in the instances recited are in concert with the exceptions noted by the Legislature that do not constitute waste of water under the [M]WUA.  *See* § 85-2-505(1)(a), (b), (c), and (d)").  The Hearing Examiner explained that *Diamond Cross* "focused narrowly" on application of the statutory scheme governing the production of coalbed methane, § 82-11-175, MCA, for a project located within a controlled groundwater area, unlike Tintina's mine here.  MTU did not thereafter raise *Diamond Cross* before the District Court, nor in its briefing to this Court.

23

interpretation and the common law, Tintina would not qualify for a permit of this latter category of water. *See* § 85-2-311(1)(d), MCA (requiring a beneficial use to qualify for a permit); *see also Power*, 21 Mont. at 529-30, 55 P. at 35 ("[I]f he has no intention of using such excess . . . or to otherwise apply it to a useful purpose, he acquires no valid right to such excess."). The structure of the MWUA and the language of § 85-2-505(1)(c), MCA, specifically exempting extracted water that is not beneficially used from the definition of "waste," plainly posits that mine dewatering would otherwise constitute "waste," thereby excluding it from a "use" that requires a right permit. The MWUA's exclusion of dewatering from waste thus leaves a third category of water manipulations, a category over which MWUA provides DNRC no administrative authority.[5]

¶32　DNRC's statutory interpretation is also reinforced by the other language of the exemption, which provides, "in the following cases the *withdrawal or use* of ground water may not be construed as waste under this part," § 85-2-505(1), MCA (emphasis added), thus implying a distinction between groundwater "withdrawal" and groundwater "use." Consistent therewith, § 85-2-505(1)(c), MCA, defines non-waste or waste-exempted water manipulations as those where water is manipulated "for the sole purpose" of removing it from land or mine. That is, the water itself will serve no other purpose, and the manipulation

---

[5] The Department notes that the Court has previously recognized other waters for purposes of the Act. *See Bostwick Properties, Inc. v. DNRC*, 2013 MT 48, ¶¶ 24, 31, 369 Mont. 150, 296 P.3d 1154 (holding that the developer did not qualify for a water right under the Act's appropriative criteria for stormwater runoff diverted and impounded by the development, and the Department was not required to consider such non-appropriative water sources).

24

is merely to remove the water from that location. MTU's position that the statute requires a beneficial use application for both the water Tintina will put to use in the mine, and the water Tintina will return to the aquifer without use, is inconsistent with this language, and would merge the distinctions made by the Act.[6]

¶33 We conclude the District Court correctly affirmed the Department's application of the MWUA to Tintina's application.

¶34 *3. Whether DNRC interpreted the Montana Water Use Act in contravention of Article IX of the Montana Constitution.*

¶35 Article IX, Section 1, of the Montana Constitution provides: "The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations. The legislature shall provide for the administration and enforcement of this duty." Further, as pertaining to water, the Montana Constitution provides:

> (3) All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law.

---

[6] The Dissent offers that "Tintina's release of water into Sheep Creek constitutes yet another appropriation" because beneficial use is also defined as "a use of water for aquifer recharge or mitigation." Dissent, ¶ 67. However, "aquifer recharge" is a process term of art that is defined as the controlled addition of water to either the aquifer or the surface "to offset adverse effects resulting from net depletion of surface water," § 85-2-102(3), MCA, for purposes of protecting senior water holders in a closed basin from a proposed beneficial use appropriation. *See* § 85-2-360, MCA, et seq. This is the process that was followed regarding Tintina's beneficial use application for the 350 acre-feet of groundwater, and its mitigation plan was found by DNRC to have fully mitigated the net depletion to surface waters resulting from its application, which is not contested by MTU. The discharge of the mine dewatering water, regulated by the Department of Environmental Quality, as explained herein, does not come within the definition of "aquifer recharge." Neither is this water being "withdrawn in a closed basin without mitigation," Dissent, ¶ 50, because, unlike the 350 acre-feet subject to net depletion mitigation under Tintina's beneficial use appropriation, it is being returned to the aquifer.

25

(4) The legislature shall provide for the administration, control, and regulation of water rights and shall establish a system of centralized records, in addition to the present system of local records.

Mont. Const. art. IX, § 3.

¶36 Referring to these provisions, MTU argues that "[r]ead together, the Constitution's water-rights provisions compel an interpretation of the Water Use Act that will ensure all of Montana's water resources are comprehensively regulated and protected." Thus, according to MTU, if MWUA allows DNRC to administer mine dewatering as belonging to a third category beyond "waste" or "beneficial use," then MWUA is unconstitutional because such a dewatering "loophole" circumvents the constitutional requirement that Montana's waters be "comprehensively regulated and protected." DNRC and Tintina answer that MTU's constitutional challenge fails because it is unsupported in our jurisprudence and mistakenly interprets the MWUA to broadly regulate water resources beyond the administration of water rights.

¶37 The MWUA was implemented for the primary purpose of regulating water rights in Montana in satisfaction of Article IX, Section 3 of the Montana Constitution. Section 85-2-101(2), MCA ("A purpose of this chapter is to implement Article IX, Section 3(4), of the Montana constitution, which requires that the legislature provide for the administration, control, and regulation of water rights and establish a system of centralized records of all water rights. The legislature declares that this system of centralized records recognizing and establishing all water rights is essential for the documentation, protection, preservation,

26

and future beneficial use and development of Montana's water for the state and its citizens and for the continued development and completion of the comprehensive state water plan."); *see Clark Fork*, ¶ 50. As we have explained, despite having referenced Article IX, Section 3(4) in § 85-2-101(2), MCA, "the Legislature did not enact the MWUA for the primary purpose of implementing, satisfying, or tailoring it to its environmental protection duty under Montana Constitution Article II, Section 3, and Article IX, Section 1." *Clark Fork*, ¶ 50. Rather, "[t]he Legislature enacted the MWUA for the specific purpose of implementing and fulfilling its separate duty under Article IX, Section 3 (in re state ownership of Montana waters and state 'administration, control, and regulation of water rights' under a centralized water rights administration and records system). Section 85-2-101, MCA." *Clark Fork*, ¶ 50. In furtherance of these goals, MWUA authorizes DNRC to regulate water rights (beneficial uses) and water waste (non-beneficial uses). It does not grant DNRC the ability to further regulate the water itself.

¶38     Secondarily, MWUA is intended to "encourage the wise use of the state's water resources by making them available for appropriation consistent with this chapter and to provide for the wise utilization, development, and conservation of the waters of the state for the maximum benefit of its people with the least possible degradation of the natural aquatic ecosystems." Section 85-2-101(3), MCA. "[T]he Legislature served that secondary purpose, extraneous and without reference to its Article IX, Section 1 environmental protection duty," *Clark Fork*, ¶ 51, by providing regulatory authority elsewhere, including to the Department of Environmental Quality which, under the Montana Water Quality Act

27

(MWQA) and the Metal Mine Reclamation Act (MMRA), is charged with further regulating the water resource: All discharges of water in Montana are subject to non-degradation standards and all mining activities must first undergo a permitting process which entails the review of the project's hydrological impacts. *See* § 75-5-303, MCA ("Existing uses of state waters and the level of water quality necessary to protect those uses must be maintained and protected."); §§ 82-4-301, -335, -351, MCA (declaring the intent of MMRA "to prevent unreasonable depletion and degradation of natural resources" and establishing that "[a] person may not engage in mining [activities] in the state without first obtaining a final operating permit from the [DEQ]" and that an application for a MMRA permit may be denied if "the plan of operation or reclamation conflicts with . . . [MWQA]"); *Clark Fork*, ¶ 51; *Pud No. 1 v. Wash. Dep't of Ecology*, 511 U.S. 700, 719, 114 S. Ct. 1900, 1912 (1994) (holding that, under the Clean Water Act, water *quantity* is regulated as a component of water *quality*).[7]

¶39     The District Court reasoned that "[MTU]'s argument that the Constitution requires that the Water Use Act not only manage water *rights* but provide comprehensive management of water *resources* (including some method to evaluate the impacts of mine dewatering within the permitting process) is novel but without citation to authority and

---

[7] The Dissent labors under the proposition that the water being removed from the mine and returned to the aquifer is "completely unexamined and unregulated," creating a "giant loophole," Dissent, ¶ 50, and will "escape state oversight." Dissent, ¶ 71. This ignores the system of water regulation outside of the MWUA, and our opinion recognizing this broader regulation in *Clark Fork*.

further analysis, it cannot meet the burden." (Emphasis in original.) In coming to this conclusion, the District Court properly applied our decision in *Clark Fork*.

¶40 In accordance with our ruling in *Clark Fork*, we conclude the District Court correctly held that the Department has properly interpreted the MWUA, and that the interpretation does not render the Act unconstitutional. The exemption of mine dewatering from MWUA's permitting requirements does not inhibit the Act's purpose of regulating water rights, as required by Article IX, Section 3 of the Montana Constitution. Further, while beyond the DNRC's authority, evaluation of mine dewatering impacts is provided by other statutory frameworks. A statute is presumed to be constitutional, *Akhmedli*, ¶ 3, and we conclude MTU has not satisfied its burden to establish that the MWUA is unconstitutional.

¶41 Ultimately, whether this regulatory system is ideal or preferable is a determination for the Legislature to make. As noted by the Dissent, ¶ 68, mine dewatering has been found to be a beneficial use "[u]nder the language" of another jurisdiction's statute, and a couple other states have enacted statutes requiring a permit for mine dewatering. However, that does not allow us to import these requirements into Montana statutes. While, as the District Court observed, "[i]t is presumed that the legislature is acquainted with the law; that it has knowledge of the state of it upon the subjects on which it legislates; that it is informed of previous legislation and the construction it has received," *Baitis v. Dep't of Revenue*, 2004 MT 17, ¶ 24, 319 Mont. 292, 83 P.3d 1278, the legislative record here shows the Department's longstanding application of the MWUA, including its dewatering policy, has been specifically brought to the Legislature's attention. It remains, as far as this case is

29

concerned, the Legislature's prerogative to review and, if necessary, revise the MWUA or the larger regulatory structure.

¶42     Affirmed.


/S/ JIM RICE

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR


Chief Justice Mike McGrath, concurring.

¶43     I concur with the Court's Opinion and that Tintina may not raise Appellants' standing for the first time on appeal.  I write separately to address that Appellants do, however, have standing to challenge DNRC's permitting decision.

¶44     Tintina rightly concedes that Appellants' interests would demonstrate standing on behalf of their members in a case involving environmental harms—there can be no serious dispute that Appellants' recreational and aesthetic injuries are sufficient to confer standing in such cases. *See, e.g.*, *Park Cnty. Env't Council v. Mont. Dep't of Env't Quality*, 2020 MT 303, ¶¶ 20–24, 402 Mont. 168, 477 P.3d 288.  Nevertheless, Tintina argues that here, in the context of MWUA, only a senior water rights holder would be able to bring an objection to its permit application.  This argument is against the plain language of MWUA, DNRC's acceptance of Appellants' standing and its administrative rules, and public policy.

¶45    Section 85-2-308(4), MCA, says that "[a] person has standing to file an objection under this section if the property, water rights, *or interests* of the objector would be adversely affected by the proposed appropriation." (Emphasis added.) Clearly, *a person* who has *interests*—apart from their property or water rights—that would be adversely affected by the proposed appropriation has standing to object. "A" person with an interest does not limit the class of people to only those with senior water rights; instead, the statute allows "any" person with an interest to object. *Cf. State v. Levine*, 2024 MT 169, ¶ 16, 417 Mont. 410, 553 P.3d 416 (defining "a").

¶46    Tintina's only analysis in support of its argument analogizes *Baxter Homeowners Association v. Angel*, 2013 MT 83, 369 Mont. 398, 298 P.3d 1145, where we held that Angel was not an "aggrieved party" as defined by § 49-2-101(2), MCA, and as required under § 49-2-501, MCA, to file a complaint of discrimination under the Montana Human Rights Act. There, however, Angel had no "specific personal and legal interest" that "specially and injuriously affected" him as he was not disabled, nor did he have any close associations to someone such that he could bring the litigation on their behalf. Section 49-2-101(2), MCA; *Baxter*, ¶ 18.

¶47    Here, MWUA confers standing on any person who has an interest, other than and in addition to persons with property or water rights, that may be adversely affected by the proposed appropriation. Section 85-2-308(4), MCA. Appellants demonstrated that they have aesthetic and recreational interests in the Smith River and the tributaries at issue in this litigation and that their interests in publicly-owned water rights would be adversely affected

by Tintina's proposed appropriation. The plain language of MWUA confers standing on Appellants in the same way that they would have standing to defend their interests in "cases involving environmental harms." *See also Mont. Trout Unlimited v. Beaverhead Water Co.*, 2011 MT 151, ¶ 33, 361 Mont. 77, 255 P.3d 179 (common law standing requirements plus compliance with statutory requirements enough to confer right to participate in a similar MWUA hearing).

¶48 Finally, DNRC's own interpretation of § 85-2-308(4), MCA, is consistent with the plain language meaning, discussed above. DNRC has promulgated rules regarding requirements to object to an application under § 85-2-302, MCA. *See* Admin. R. M. 36.12.117 (2024). This rule requires an objector to state facts explaining how the objector has standing, and to describe how the objector's interests will be adversely affected. Admin. R. M. 36.12.117(9)(g) (2024). The rule goes on to describe further requirements "if [the] objector is claiming adverse effect to instream flow water rights for fish, wildlife, and recreation." Admin. R. M. 36.12.117(9)(h) (2024). Clearly, DNRC understands that some objectors with an "interest" apart from their "property" or "water rights" will be objecting because of fish, wildlife, recreational, or aesthetic interests.

¶49 In this case, Appellants described their interests in recreating on and protecting publicly-owned water rights that were threatened by Tintina's application. DNRC recognized these interests as "correct and complete" and accepted their objections to the application. Appellants have standing under common-law principles, which Tintina does

32

not dispute. The plain language and agency interpretation of § 85-2-308(4), MCA, does not limit Appellants' standing. I would also reject Tintina's standing argument on the merits.

/S/ MIKE McGRATH

Justice Laurie McKinnon, dissenting.

¶50 I disagree with the Court's conclusion that mine dewatering is not a beneficial use requiring a water use permit. Of the 807 acre-feet of groundwater Tintina plans to withdraw from the mine each year, the withdrawal of well over half of it—457 of those acre-feet— will be completely unexamined and unregulated. Tintina acknowledges in its permit application the withdrawal of 350 acre-feet of water will have impacts to the surface water in Black Butte Creek, Coon Creek, and Sheep Creek. The Court's interpretation of the MWUA undermines the statute's purpose to protect senior water right holders and prevent piecemeal litigation by allowing for a giant loophole where large quantities of water can be withdrawn in a closed basin without mitigation simply because the party claims the water is not being "used."

¶51 Under our Constitution, the Montana Legislature must "provide for the administration, control, and regulation of water rights" and "provide adequate remedies to prevent unreasonable depletion and degradation of natural resources." Mont. Const. art. IX, § 3(4); Mont. Const. art. IX, § 1. "The Water Use Act was designed to protect senior water rights holders from encroachment by junior appropriators adversely affecting those senior rights." *Mont. Power Co. v. Carey*, 211 Mont. 91, 98, 685 P.2d 336, 340 (1984). The

33

"protection of senior water rights . . . is the [MWUA's] core purpose." *Clark Fork Coal. v. Tubbs*, 2016 MT 229, ¶ 24, 384 Mont. 503, 380 P.3d 771. Accordingly, "the [MWUA] requires that a prospective junior appropriator show that water is legally and physically available, the proposed use of water is for a beneficial use, and the new appropriation will not adversely affect existing water rights of senior prior appropriators." *Tubbs*, ¶ 6; § 85-2-311(1)-(2), MCA.

¶52 To protect Montana waters for the use of its people, the MWUA provides that "[a] person may appropriate water only for a beneficial use" and "the application of water to anything but a beneficial use" is prohibited as unlawful "waste." Sections 85-2-301(1), 85-2-102(27), MCA. The structure of the MWUA thus deems applications for water are either for beneficial use or impermissible waste. The MWUA was designed to provide for comprehensive management of Montana's water resources for the benefit of its owners— Montana citizens. The MWUA implements the constitutional directive that "[a]*ll* . . . waters within the boundaries of the state are the property of the state for the use of its people *and* are subject to appropriation for beneficial uses as provided by law." Mont. Const. art. IX, § 3(3) (emphasis added). Thus, water applications may be divided into one of two classes: "beneficial use," defined in § 85-2-102(27), MCA, which can be authorized only by permit; and "waste," which is the unlawful "application of water to anything but a beneficial use," §§ 85-2-102(27) and 85-2-301(1), MCA.

¶53 In defining which uses of groundwater fall into the category of impermissible "waste," the Legislature *specifically excluded mine dewatering*: "the disposal of ground

34

water without further beneficial use . . . that must be removed from a mine to permit mining operations" may "not be construed as waste[.]" Section 85-2-505(1)(c), MCA. "[W]ithout further beneficial use" highlights the legislative intent that waters withdrawn for the purpose of mining and not subject to further beneficial use, i.e., not "wanted" by the appropriator, are nonetheless appropriated for the benefit of the mining operation and thereby subject to the permitting requirements of the MWUA. Consistently, the MWUA defines "beneficial use" as a use of water "for the benefit of the appropriator, . . . including but not limited to . . . mining[.]" Section 85-2-102(5)(a), MCA. Accordingly, Tintina's use of groundwater to mine cannot be construed as "waste" under the § 85-2-505(1)(c), MCA, dewatering exclusion of the MWUA; and must be deemed a "beneficial use" under the § 85-2-102(5)(a), MCA, definition of beneficial use of the MWUA. The MWUA also defines "appropriation" as including "use for an aquifer recharge or mitigation[.]" Section 85-2-102(f), MCA. Hence, the plain language and text of the MWUA compels no other conclusion but that mine dewatering is a beneficial use that must meet the requirements of the MWUA. The Court has created a loophole in the legislative design and structure of the MWUA. However, each provision of the MWUA, together with its purpose to comprehensively regulate "all" waters in Montana, can be read consistently together so that senior water right holders and Montana citizens have their rights and water resources protected.

¶54     Thus, the Legislature has provided that "a person may not appropriate water except as provided [in Title 85, Chapter 2, MCA]." Section 85-2-301, MCA. Title 85, Chapter 2,

MCA, sets forth the permitting requirements and process for appropriating water. There are very limited exceptions to the requirement that a permit first be obtained before appropriating water. Section 85-2-306, MCA, provides several *de minimis* exceptions to the permit requirement. However, importantly, there is no exception to the permitting requirements contained within § 85-2-306, MCA, or the entire MWUA, for mine dewatering. The Court is thus creating an exception for mine dewatering where none exists; further, the exception the Court creates is certainly not consistent with those exceptions for *de minimis* usage the Legislature has created. The Court's dewatering loophole allows a large amount of water—nearly 150,000,000 gallons annually—withdrawn by Tintina to escape State oversight in direct contravention to the MWUA's stated purpose. Here, Tintina intends to dig a series of tunnels that extend 460 to 1,640 feet into the ground so that Tintina may access its copper deposits. Through Tintina's actions of drilling these tunnels to reach their copper deposits, they cause to be produced from these wells[1] a continuous flow of large volumes of groundwater from the closed Missouri River basin that Tintina will divert, pump, and remove to the surface so it can mine its copper deposits.

¶55 Tintina argues that it is exempt from the permitting requirements and any state oversight because it does not have an actual intent to control and affirmatively use the water. Tintina's argument that because it has no desire to "employ" its unpermitted diversion for

---

[1] Section 85-2-102(34), MCA, defines "[w]ell" as "any artificial opening or excavation in the ground, however made, by which ground water . . . flows under natural pressures or is artificially withdrawn."

a "purpose," there is no basis for the Department to declare a diversion of 457 acre-feet a "beneficial use," is unsupportable and disregards the facts. The Court's reliance on caselaw that Tintina's intent as the appropriator is controlling, Opinion ___, first, acknowledges that Tintina is, in fact, appropriating water for its use. Second, the Court ignores and does not address that Tintina is beneficially appropriating at numerous points during its "unintended use" of groundwater when (1) Tintina initially collects the water; (2) Tintina impounds the water; (3) Tintina allows the impounded water to evaporate for several months because high nitrogen levels prevent its discharge into Sheep Creek; (4) Tintina conveys the water to the mine's treatment plant; and (5) finally, Tintina discharges the groundwater through Tintina's "underground filtration galleries" into a different place in Sheep Creek. Therefore, to say that Tintina does not "employ" the water for its mining operations is contrary to the meaning of "appropriation" and "beneficial use" as contained in § 85-2-102, MCA, and defies logic.

¶56    The facts of this case demonstrate the threat a mine dewatering exception presents to Montana's waters and senior water rights. Tintina has already acknowledged the adverse effects on prior appropriators to Black Butte Creek, Coon Creek, and Sheep Creek downstream of Little Sheep Creek. Of the 807 acre-feet of groundwater Tintina will use for its mining operation, Tintina will apply 350 acre-feet of groundwater for "industrial purposes" at the mine and has obtained a groundwater permit with plans to mitigate adverse effects by offsetting depletions to surface waters in the affected drainages of Coon Creek, Black Butte Creek, and Sheep Creek. If there are admitted adverse effects from dewatering

37

350 acre-feet of groundwater, then clearly the diversion of 407 acre-feet would adversely affect the underlying aquifer and surrounding tributaries. Hence, most of the groundwater which Tintina will disturb and use for its mining operations is already known to produce adverse effects and yet will escape state oversight. Further, Tintina's plan to discharge the water back into Sheep Creek through its infiltration galleries is nothing more than an unenforceable promise. The water returned to the aquifer would be deposited into Sheep Creek and the lower portion of Coon Creek and would do nothing to offset the losses in Black Butte Creek and the upper portion of Coon Creek.

¶57    Tintina, DNRC, and Amicus raise concerns that any draining of wastewater would now be subject to permitting, such as dam diversions, stormwater drainage, or the draining of a field. The situations Tintina and DNRC raise are distinguishable from the situation present here. In the case of Tintina's *planned* mine *dewatering*, *diversion* and *impoundment*, there is extended impoundment, control, and deliberate replacement of the water that is being drained. Tintina, itself, will cause the movement and displacement of huge amounts of water to carry out its mining enterprise. This scheme necessitates much more control over the water than a simple draining of a field or redirecting of stormwater. Under the permit requirements of § 85-2-302, MCA, only individuals who appropriate water or "commence construction" to accomplish a "diversion, impoundment, withdrawal, or related distribution works" are required to get a permit, unless a statutory exemption applies. In the absence of such activity, the public is not prevented from removing or redirecting water when, for example, it rains, a storm system is required, or a stream-restoration project

38

is needed. These examples represent a *de minimis* use of water. The Legislature acknowledged that not every diversion, impoundment, or withdrawal of water is significant enough to require a permit. Among other *de minimis* ground water appropriations, the MWUA creates an exception to the permit requirement when, "by means of a well[,] . . . the appropriation is outside a stream depletion zone, is 35 gallons a minute or less, and does not exceed 10 acre-feet a year." Section 85-2-306(3)(a)(iii), MCA. Tintina plans to appropriate 457 acre-feet per year without going through a permitting process. Tintina's plans to impound and treat the water before discharging it to Sheep Creek will potentially and significantly shift the availability of water in the aquifer in terms of location.

¶58 The explicit exceptions give insight into the kind of diversions and withdrawals that should be exempt from permitting requirements. In addition to the exempt well provision contained at § 85-2-306(3)(a)(iii), MCA, §§ 85-2-306(3)(a)(i), (ii), (iv), MCA, establish additional and similarly limited exceptions for small wells and "developed spring[s]." In *Tubbs*, we rejected an attempted expansion of the exemptions contained in § 85-2-306, MCA, finding it inconsistent with the legislative purpose underlying the statute. *Tubbs*, ¶ 28 (rejecting a rule that "expanded the narrow exemption to the permitting process" under § 85-2-306, MCA, and was accordingly "inconsistent with the stated statutory purpose of the [MWUA]"). Section 85-2-306, MCA, also equips the Department to establish similar exceptions through rules adopted under § 85-2-113, MCA. Section 85-2-306(8), MCA. The DNRC has not adopted a rule pertaining to mine dewatering, only a policy. The Legislature anticipated the potential need for certain exceptions and routine necessities,

such as stormwater drainage and dam diversions, which could easily be exempted from permitting.

¶59 Further, in contrast to the dewatering loophole created by the Court when it concludes there is no beneficial use, we have previously held activities such as offering water for sale and preserving in stream flows for ecological and recreational purposes are beneficial uses under the MWUA. *See Curry v. Pondera Cnty. Canal & Reservoir Co.*, 2016 MT 77, ¶ 35, 383 Mont 93, 370 P.3d 440 (providing water for sale and issuing shares is a beneficial use in and of itself regardless of how much water is actually used by the shareholders); *See Hohenlohe v. State*, 2010 MT 203, ¶ 49, 357 Mont. 438, 240 P.3d 628 (instream flow is a beneficial use). These examples show there have been instances when there is a beneficial use even when the water itself is not being directly applied to a particular physical task such as irrigation, though it is still being "used" in the sense that it is being employed for the appropriator's purpose.

¶60 Several lower courts in Montana have considered a similar issue of dewatering mines in coal bed methane (CBM) gas production. Just as here, ground water must be pumped to the surface as part of the methane gas extraction process, so large quantities of ground water must be pumped out and disposed of for CBM production. *Diamond Cross Props.*, 2008 Mont. Dist. LEXIS 180, at *6. The DNRC in *Diamond Cross Props.* argued an extraction of water not put to further beneficial use was not a beneficial use requiring a permit and pointed to several agency decisions affirming this. *Diamond Cross Props.,* 2008 Mont. Dist. LEXIS 180, at *15. The court rejected DNRC's argument, explaining:

40

This Court does not dispute the DNRC's position in the context of the referenced examples [of DNRC findings that manipulation or movement of ground water has not required a beneficial use]. Indeed, the rulings made by the DNRC in the instances cited are in concert with the exceptions noted by the Legislature that do not constitute waste of water under the [MWUA]. See § 85-2-505(1)(a), (b), (c), and (d). However, the disposition of CBM produced ground water is distinguishable because the *quantity of water* that is produced in CBM extraction *dwarfs the amounts of water disposed of in the examples cited by the DNRC.* Additionally, the examples preferred by DNRC were outside a controlled ground water area. These distinctions and the anticipated impacts, real or imagined, of *substantial dewatering of aquifers require appropriate State regulatory review to give effect to the mandates of Article IX, § 3(3) and the Legislative policy reflected in the [MWUA].*

*Diamond Cross Props.*, 2008 Mont. Dist. LEXIS 180, at \*15-16 (emphasis added). The court ultimately held that "the Montana Constitution and relevant statutes require management of CBM ground water for beneficial purposes" and that "[d]isposal of CBM ground water in a manner without any recognized benefit from the water does not pass constitutional muster." *Diamond Cross Props.*, 2008 Mont. Dist. LEXIS 180, at \*23-24. The court noted that "[b]oth the CBM and the water resulting from CBM production represent value to the people, industry, and wildlife in Montana." *Diamond Cross Props.*, 2008 Mont. Dist. LEXIS 180, at \*24. Thus, the release of CBM water back to surface waters was deemed a beneficial use. *Diamond Cross Props.*, 2008 Mont. Dist. LEXIS 180, at \*20. Two years later, relying on *Diamond Cross Props.*, another district court found a Record of Decision by the Montana Oil and Gas Board authorizing groundwater produced from CBM production was unconstitutional when it allowed the wastewater from CBM production be placed into evaporation pits without any beneficial use analysis. *Tongue &*

*Yellowstone Irrigation Dist. v. Mont. Bd. of Oil & Gas Conservation*, No. BDV-2003-579, 2010 Mont. Dist. LEXIS 116, *17-18 (Mont. First Judicial Dist. March 5, 2010).

¶61 A similar conclusion is required here. Although not operating in a controlled ground water area, Tintina plans to pump millions of gallons of water from an aquifer in a closed and highly appropriated basin—without any State regulatory review or any mandatory mitigation measures of the adverse impacts Tintina has acknowledged exist. The magnitude of the diversion from the Upper Missouri River Basin, which is closed to new appropriations due to the "crisis" of "over-appropriat[ion]," is alarming. *Montana Trout Unlimited v. Mont. Dep't of Nat. Res. & Conservation*, 2006 MT 72, ¶ 8, 331 Mont. 483, 133 P.3d 224; § 85-2-343 MCA. "The Smith River is . . . subject to the Upper Missouri River basin moratorium[,]" and the DNRC has "recognized the particularly intimate relationship between groundwater and surface water along the Smith River." *Montana Trout Unlimited*, ¶¶ 7-10. In *Diamond Cross Props*, the lower court understood what this Court refuses to face; that is, the ground water produced in mining operations dwarfs the amounts of water that might constitute *de minimis* exceptions to State regulatory review. While a substantial challenge to mining production, this Court cannot ignore existing Montana law embodied in the MWUA or the mandates of Article IX, Section 3(3), of the Montana Constitution.

¶62 The Court claims DNRC's longstanding Dewatering-Drainage Policy should be entitled to deference. DNRC's policy was adopted in 1981 and provides:

> The process of dewatering a water source does not require a Permit Application (Form 600), nor the filing of a Completion (Form 602) with the Department where there is no intent to apply any of the water to a beneficial

> use. . . The mere dewatering of a water source without a beneficial use does not constitute an appropriation; therefore, no water right can be established solely by dewatering.

DNRC Dewatering-Drainage Policy, AR: 1288-1291. To begin, the policy is blatantly inconsistent with a specific provision of the MWUA and, for that reason alone, is invalid. *Mont. Power Co. v. Mont. Pub. Serv. Comm'n*, 2001 MT 102, ¶¶ 25-27, 305 Mont. 260, 26 P.3d 91. The Legislature has defined an "appropriation" as a "use of water for aquifer recharge or mitigation." Section 85-2-102(1)(f), MCA. There is no dispute that Tintina plans to divert the unpermitted 457 acre-feet it does not want back into Sheep's Creek through a series of infiltration galleries to recharge the aquifer. Before doing so, however, it must impound and store the water during the summer months to avoid violating the stricter non-degradation standard for nitrogen during the summer months. This clearly *is* an "appropriation" under the definition provided by § 85-2-102(1)(f), MCA, yet the DNRC's policy provides that it is *not* an appropriation. "When we assess the validity of an agency rule, we must begin with an examination of the statute itself." *Tubbs*, ¶ 20 (citation omitted). Our goal in interpreting a statute is to implement the objectives the Legislature sought to achieve. *Montana Wildlife Fed'n v. Sager*, 190 Mont. 247, 264, 620 P.2d 1189, 1199 (1980). If legislative intent can be determined from the plain meaning of the words used in the statute, the plain meaning controls and the Court need go no further nor apply any other means of interpretation. *State v. Trull*, 2006 MT 119, ¶ 32, 332 Mont. 233, 136 P.3d 551. Words and phrases used in a statute are to be construed according to the context in which they are found, and according to their normal usage, unless they have acquired some

43

peculiar or technical meaning. Section 1-2-106, MCA. Section 2-4-305(6), MCA, provides that "[w]henever by . . . statute a state agency has authority to adopt rules[,] . . . a rule is not valid or effective unless it is: (a) consistent and not in conflict with the statute; and (b) reasonably necessary to effectuate the purpose of the statute." We have also held that "'[r]ules adopted by administrative agencies which conflict with statutory requirements or exceed authority provided by statute, are invalid.'" *Tubbs*, ¶ 25 (quoting *Haney v. Mahoney*, 2001 MT 201, ¶ 6, 306 Mont. 288, 32 P.3d 1254); *see also State ex rel. Swart v. Casne*, 172 Mont. 302, 308, 564 P.2d 983, 986 (1977) (holding agency rules void because a statute cannot be changed by administrative regulations), *overruled on other grounds*, *Trs. Of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 46, 315 Mont. 210, 69 P.3d 663.

¶63 The DNRC policy upon which the Court relies to create a dewatering loophole is plainly inconsistent with the statute. The policy, which has not been adopted as a rule, is invalid because it conflicts with the plain language of § 85-2-102(1)(f), MCA, and because the Legislature, as is its prerogative, has placed a meaning on "appropriation." The policy has also placed a meaning, as discussed previously, on "beneficial use" which is clearly inconsistent with the statutory definitions. Section 85-2-102(5)(e), MCA ("beneficial use" is a "use of water for aquifer recharge or mitigation"); and § 85-2-102(5)(a), MCA ("beneficial use" means "use of water for the benefit of the appropriator, . . . including . . . mining[.]"). In contradiction to the plain language of the statutes, DNRC has determined that its policy is not to find a beneficial use for aquifer recharge and mitigation, or use of

44

groundwater for purposes of mining. The policy must be invalidated as inconsistent with the plain language of the statute.

¶64    DNRC has upheld its policy in two water permitting cases, *Kenyon-Noble* and *CR Kendall*. *In the Matter of the Application for Beneficial Water Use Permit No. 24591-g41H by Kenyon-Noble Ready Mix* (1981) (*Kenyon-Noble*); *In re Applications for Beneficial Water Use Permits 41T-104524, 41T-104526, 41T-104527 by CR Kendall* (1999) (*CR Kendall*). However, the DNRC's dewatering loophole has never been formalized by regulation. Thus, it is important to note that this policy was not subject to notice-and-comment rulemaking and went into effect without any public input. Here, the Court's analysis and decision is based on DNRC policy and on two agency decisions that issued permits pursuant to that policy. The Court relies on the doctrine of agency deference when the agency has never adopted a rule. However, because the DNRC has, for nearly a half century, failed to formalize its interpretation through rule-making, the DNRC's interpretation does not constitute the kind of agency action that could merit any deference by this Court, especially since it is inconsistent with the purpose and text of the Act to "comprehensively adjudicate existing water rights and regulate water use," § 85-2-101(6), MCA, and "to provide for the wise utilization, development, and conservation of the waters of this state for the maximum benefit of its people with the least possible degradation of the natural aquatic ecosystems," § 85-2-101(3), MCA. Long standing interpretations are not binding on courts, and they must yield if there is a judicial determination that the construction is inconsistent with the legislative purpose and intent underlying the statute.

45

*Mont. Power Co.*, ¶ 25. In this case, even assuming a policy which, for over forty years was never formalized into a rule, is entitled to "respectful consideration," *Mont. Power Co.*, ¶ 25, this Court should not sanction a DNRC policy that creates a gaping loophole in the MWUA and undermines the statute's purpose of providing a comprehensive system to regulate water use and provide for the wise utilization, development, and conservation of Montana's waters. Here, the text of the MWUA defines water appropriated for mining as a beneficial use, § 85-2-102(5)(a), MCA, and not a "waste" of water, § 85-2-505(1)(c), MCA.

¶65 The clear purpose of the MWUA is to protect senior water rights and ensure new appropriations do not negatively impact senior rights. Section 85-2-101, MCA. If, because of agency policy, mine dewatering is not considered a beneficial use, then potentially unlimited amounts of groundwater can be withdrawn—even from closed basins—and discharged without any consideration and state oversight of how it will affect senior water rights holders or Montana's waters. Tintina's permit for the 350 acre-feet they do plan to use in mining operations included buying out senior water rights and providing mitigation measures to compensate for the withdrawal of water from this area which will affect water availability for other senior rights. Under DNRC's current interpretation, Tintina will be allowed to withdraw an additional 457 acre-feet of water a year without evaluating the impact of such a withdrawal or engaging in any mitigation efforts. This presents a significant potential gap in regulating water use and ensuring protection of senior water rights, all of which is premised upon an agency policy never adopted formally into a rule.

"Uncontrolled development of a valuable natural resource contradicts the spirit and purpose underlying the Water Use Act." *Carey*, 211 Mont. at 96, 685 P.2d at 339.

¶66 The underlying premise relied on by this Court that dewatering is not a beneficial use has huge ripple effects to the structure of the MWUA. For example, as previously discussed, Tintina is required to hold water for the summer months to avoid violating the stricter summer non-degradation standard for nitrogen, meaning any groundwater extracted during that time will be held in storage by Tintina and not released back to Sheep Creek for a full three months. Substantial amounts of water will evaporate and a substantially large portion of Tintina's unpermitted diversion would never be returned to the ground. This could present significant issues in water availability during a time when water is most scarce. Here, there is both the beneficial use of impoundment and a consumptive use of evaporation. *See* Admin. R. M. 36.12.101(14) (2024) (defining "[c]onsumptive use" to include evaporation).

¶67 Tintina's release of water into Sheep Creek constitutes yet another appropriation. Listed clearly as one of the definitions for beneficial use is "a use of water for aquifer recharge or mitigation." Section 85-2-102(5)(e), MCA. Aquifer recharge is defined as "either the controlled subsurface addition of water directly to the aquifer or controlled application of water to the ground surface for the purpose of replenishing the aquifer to offset adverse effects resulting from net depletion of surface water." Section 85-2-102(3), MCA. Tintina's groundwater model predicted a 157 gallons per minute decrease in groundwater discharge to Sheep Creek in the absence of the mine's infiltration galleries.

47

As the company's recharging system would thus partially compensate for the loss of base flow in Sheep Creek caused by mine dewatering, all the mine's unpermitted diversion would serve a beneficial purpose at the mine site. Although all these beneficial uses are specifically defined and addressed in the MWUA, the Court's faulty foundational premise that dewatering is not a beneficial use because Tintina does not want the water, an argument rooted in "*appropriator* intent," together with its misplaced and erroneous reliance on a DNRC policy, is not only wrong, but will have huge ramifications for the water supply of Sheep Creek, its surrounding tributaries, the underlying aquifer, and other Montana waters impacted by mining.

¶68    Although not necessary to look at other jurisdictions given the plain language and text of the MWUA, prior appropriation jurisdictions that have considered the issue of mine dewatering have concluded that mine dewatering is a beneficial use or have enacted statutory mechanisms ensuring state oversight and protection of senior appropriators. The Supreme Court of Colorado has held that withdrawal of water for the purposes of carrying out coalbed methane gas extraction was a beneficial use and thus subject to permitting. *Vance v. Wolfe*, 205 P.3d 1165, 1173 (Colo. 2009). The court reasoned:

> Under the language of the [Water Right and Determination Act of 1969 (1969 Act)], the [extraction of coalbed methane (CBM)] process "uses" water—by extracting it from the ground and storing it in tanks—to "accomplish" a particular "purpose"—the release of methane gas. The extraction of water to facilitate CBM production is therefore a "beneficial use" as defined in the 1969 Act. We reject the [Colorado State Engineers' and BP America Production Company's] argument that water used in CBM production is merely a nuisance rather than a "beneficial use." On the contrary, the use of water in CBM production is an integral part of the CBM process itself. The

48

> presence and subsequent controlled extraction of the water makes the capture of methane gas possible.  As our precedent in the gravel cases[2] makes clear, the fact that the water used during the CBM process may become a nuisance *after* it has been extracted from the ground and stored in above-ground tanks (that is, after it has been beneficially used) does not prevent a finding that the water is put to a beneficial use.

*Vance*, 205 P.3d at 1167.  Dewatering is also a beneficial use in Nevada. *Eureka Cnty v. Papa*, 1999 Nev. Dist. LEXIS 39, *9 (Nev. Dist. Ct. Nov. 16, 1999).  New Mexico enacted the Mine Dewatering Act to deal with this particular issue, which provides "[m]ine dewatering is neither an appropriation of water nor waste."  N.M. Stat. Ann. § 72-12A-5.  No one in New Mexico can engage in mine dewatering in a declared underground basin without a mine dewatering permit, and in issuing a permit the state engineer must consider the potential impacts on the aquifer affected and can require a plan of replacement of the permit applicant.  N.M. Stat. Ann. §§ 72-12A-7, -8, -9.  Arizona requires a dewatering permit administered by the Department of Water Resources and the statute also specifies how the water is to be used in order of priority after extraction.  Ariz. Rev. Stat. § 45-513.  In Alaska, a temporary water use authorization or water right from the Water Resources Section is required for water uses over 500 gallons per day, even non-consumptive uses.  *Permitting Large Mine Projects in Alaska*, Department of Natural Resources, https://dnr.alaska.gov/mlw/mining/large-mines/pdf/Permitting-Large-Projects-in-Alaska-

---

[2] *Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 164 (Colo. 1988) (Owner of gravel pit was required to obtain well permits in order to conduct mining activities); *Zigan Sand & Gravel, Inc. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 175 (Colo. 1988) (Gravel pit owner was required to replace evaporation losses).

2024.pdf [https://perma.cc/F6YQ-DYPJ]; *Temporary Water Use Authorization*, Alaska Department of Natural Resources, https://dnr.alaska.gov/mlw/water/twua/ [https://perma.cc/KYY6-DBQS]. Thus, states have either found mine dewatering a beneficial use *or* enacted legislation that provided a method for state oversight and a permitting process.

¶69 Unfortunately, the Court inadequately assesses the dewatering loophole, the MWUA's goals and objectives, and the MWUA's purpose in implementing the relevant provisions of the Montana Constitution. Instead, the Court tethers its analysis to two unpublished agency decisions interpreting what the agency believes is "beneficial use," despite the clear statutory language defining beneficial use to the contrary. Opinion, ¶¶ 25-32. Reliance on two agency decisions and a policy that has never been formally made into a rule constitutes nearly the Court's entire opinion. We owe a considered analysis to the people of this State concerning this important resource.

¶70 More importantly, the DNRC and this Court's creation of a dewatering exemption is a fundamental mischaracterization of the MWUA. With the MWUA, the Legislature charged the Department with implementing a comprehensive system for "the administration, control, and regulation" of all water belonging to the people of Montana to ensure the "protection, preservation, and future beneficial use . . . of Montana's water for the state and its citizens[.]" Section 85-2-101(2). Section 85-2-101(6), MCA, notes the Legislature's "intent . . . that the state, to fulfill its constitutional duties . . . comprehensively adjudicate existing water rights and regulate water use" in Montana. Rather than

50

recognizing the broad reach of the MWUA's protections consistent with *Tubbs* and our precedent, the Court affirms the Department's dewatering loophole. All of this done under the misguided premise that water pumped from the wells Tintina drills to access its copper deposits—water from the closed Missouri River Basin's aquifer—is not being "used" by Tintina in its mining operations and therefore is not a "beneficial use." Nowhere in the MWUA does the Legislature bifurcate "use" from "beneficial use." The clear language of the MWUA defines a beneficial use as "a use of water for the benefit of the appropriator . . . in mining." Section 85-2-102, MCA. Without any oversight whatsoever, nothing prevents a mine from depleting waterways through inefficient recharge, rerouting waterways and aquatic life, or simply impounding water and allowing it to evaporate. The Court's decision will allow unlimited groundwater pumping at every mine in this state, even in closed basins: a decision that defies the clear commands of the MWUA and which is disastrous to the protection of Montana's waters—all of which is achieved through a twisted analysis of beneficial use, in contravention to the clear definition provided by the Legislature.

¶71    It cannot seriously be maintained that Tintina's "tunnels" or "wells," which will extricate *150 million gallons of water per year* for the benefit of a copper mine, should escape state oversight. This is particularly astounding given the disregard of the Court that the removal of 150 million gallons per year of water is coming from a closed basin just several miles north of one of this Nation's most pristine and iconic waterways—the Smith. Because of the DNRC's "policy" and this Court's misguided deference to its policy, the

51

Court has needlessly created a glaring loophole in state oversight of Montana waters, which will prove hugely impactful to Montana's future. Montana's waters belong to its citizens. The DNRC—and this Court—are obligated to protect this resource. When we defer to agency decision-making which is inconsistent with the MWUA and fail to correct the agency's interpretation, we fail in our obligation to protect Montana citizens and our natural resources.

¶72 I deeply regret and am saddened by the Court's decision today. The MWUA provides clear guidance on how to address mine dewatering issues. The MWUA does not prevent mining; rather, it instructs on how the interests at stake are to be weighed within the parameters of existing constitutional enactments, senior water rights, and beneficial use. The Court refuses to follow the plain language of the MWUA's provisions and justifies its deviations by pointing to an agency policy, never formally made a rule, and two decisions in which the agency applied its policy. In my opinion, our decision will cause a great injustice and will have huge impacts on Montana's waters and future generations to come.

/S/ LAURIE McKINNON

Justice Ingrid Gustafson joins in the dissenting Opinion of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON